(No. 6289. April 2, 1937.)

F. I. POAGE, Trustee, Respondent, v. CO–OPERATIVE PUBLISHING COMPANY, a Corporation, Appellant; J. H. BOOR, WELLER ROBINSON, C. J. WURTZ and W. W. DEAL, Trustees, Constituting a Board of Trustees, Intervenors and Respondents, v. MUTUAL NEWSPAPER HOLDING CORPORATION, a Corporation, Intervenor and Appellant.

[66 Pac. (2d) 1119.]

Geo. H. van de Steeg, Donald Anderson and S. Ben Dunlap for Appellants.

A. L. Anderson and Hallock, Donald & Banta, for Respondents.

HOLDEN, J.—May 1, 1919, appellant Co-operative Publishing Company (hereinafter called the Publishing Company) executed and delivered a chattel mortgage to J. H. Boor, H. N. Peckhan, John W. Brandt, J. W. Tyler, Weller Robinson, C. J. Wurtz, and W. W. Deal (constituted by said trust mortgage a Board of Trustees for the holders of bonds secured thereby) to secure the payment of an issue of ten-year first mortgage gold bonds of said Publishing Company, of even date, in the sum of $75,000, covering certain personalty owned by that company.

The mortgage provides, among other things: That the trustees shall hold the mortgaged property for the equal benefit, protection, and security of all persons at any time holding or owning said bonds; that if default be made in the payment of the bonds, the trustees shall, upon written request of the holders of a majority in amount of the outstanding bonds, and upon receiving proper security for costs, expenses, and attorney's fees, take immediate steps for the foreclosure of the mortgage; "that any such suit or action shall be subject to the control of such majority in amount of the bondholders, and it shall be lawful at any time before sale of the property, for such majority to direct the trustees in writing to waive such default or breach and dismiss any suit theretofore brought for the foreclosure of this mortgage, and to vacate any judgment or decree therein obtained, . . . ."

During the year 1932 separate written agreements were entered into between the Publishing Company and certain bondholders covering the matter of an exchange of bonds

mentioned therein, respectively, for six per cent cumulative preferred stock of said Publishing Company. Among other things, the exchange agreements, respectively, provided:

"This agreement is one of a series generally similar in terms, comprising with all such agreements signed by the individual bondholders of Co-operative Publishing Company, one single contract between Co-operative Publishing Company and the said bondholders, mutually and individually obligated under all the terms thereof."

It being also therein provided that:

"This agreement shall be in effect when the party of the first part shall have obtained the signatures of the owners of not less than 75% of the outstanding bonds of Co-operative Publishing Company, to this or similar agreements, and in the event the party of the first part shall fail to obtain the signatures of 75% of the owners of such outstanding unpaid bonds before July 1, 1932, this agreement shall be void and of no effect and the party of the first part shall return to the party of the second part the bond or bonds deposited herewith."

The bonds mentioned in said exchange agreements, respectively, were endorsed: "Paid in full (giving the date) by exchange to preferred stock."

September 23, 1933, the Publishing Company executed and delivered to A. E. Hutchings, trustee, its promissory note in the sum of $6,279, bearing interest at the rate of five per cent per annum, payable in installments, to secure the payment of which that company also executed and delivered a chattel mortgage to said Hutchings, as trustee. Thereafter, June 7, 1934, Hutchings, as such trustee, assigned said note and mortgage to the Mutual Newspaper Holding Corporation, hereinafter called the Holding Company.

April, 30, 1934, Lucien P. Arant and Bernard Mainwaring, claiming to be the owners and holders of a majority in amount of the outstanding bonds, filed a petition in the district court for the appointment by the court of a trustee (in lieu of the trustees named in said trust mortgage), "to direct the execution of said trust with full power and authority to take into his possession said mortgaged property and to manage and operate the business of said corporation

(the Publishing Company) with direction to said Trustee to immediately institute foreclosure proceedings for the protection of the bondholders, . . . . '' On the same day, to wit, April 30, 1934, an order was made appointing F. I. Poage trustee with full power to take possession of the property and operate and manage the business of the Publishing Company, and directing such trustee to immediately commence suit to foreclose. And on the day of his appointment, Trustee Poage filed a complaint against the Publishing Company for the foreclosure of said trust mortgage, and summons issued and was served upon the president of that company May 1, 1934.

May 4, 1934, the Publishing Company moved the court for an order requiring said Arant, Mainwaring, and Poage to show cause why the order appointing Poage trustee should not be vacated and annulled. And on the same day the Publishing Company filed an answer to said Arant-Mainwaring petition.

May 9, 1934, the order to show cause was heard upon affidavits and testimony. May 22, 1934, findings of fact and conclusions of law were made and filed, and on the same day an order was filed annulling the order of April 30, 1934, appointing Poage trustee, which order also discharged Poage as trustee.

June 5, 1934, the Publishing Company moved to dismiss the suit commenced by Poage, upon the ground that the order of the court appointing Poage trustee had, by a later order (filed May 22, 1934), been annulled and the trustee discharged.

June 25, 1934, Boor, Robinson, Wurtz, and Deal, as the Board of Trustees named in said trust mortgage, filed notice of motion for leave to file a complaint in intervention. August 15, 1934, the court granted leave to said trustees (hereinafter called the Board) to file, and on the day last mentioned the Board filed, a complaint in intervention for the foreclosure of the trust mortgage.

September 4, 1934, the Publishing Company demurred to the complaint in foreclosure theretofore filed by said Board upon the ground that it appeared upon the face of the complaint that the cause of action upon the bonds therein de-

scribed was barred by the statute of limitations. Thereafter, September 11, 1934, the demurrer was overruled.

September 13, 1934, the Holding Company filed a complaint in intervention for the foreclosure of the chattel mortgage assigned to it by said Hutchings, as aforesaid. September 20, 1934, the Publishing Company answered the complaint in intervention of said Board. October 3, 1934, the Board answered the complaint in intervention of the Holding Company, and November 30, 1934, the Publishing Company filed an answer to the complaint of the Holding Company.

December 19, 1934, the case was tried upon the issues formed by the complaints in intervention and the answers thereto, and submitted to and taken under advisement by the court.

March 1, 1935, trustees Boor and Robinson, claiming they were acting for and represented the Board, moved to dismiss the suit. March 8, 1935, counsel for the Board moved to strike said motion from the files upon the ground, among others, that Boor and Robinson were not authorized to act for the Board.

March 29, 1935, the Holding Company filed its written consent to the dismissal of the Board's suit to foreclose the trust mortgage, and for the purpose of obtaining a dismissal of that suit joined trustees Boor and Robinson.

March 29, 1935, T. C. Pearson, C. F. Oellien and F. L. Dickerson (hereinafter called the Protective Committee), claiming that, as a Protective Committee, they were acting for and represented a majority in numbers and amount of the holders of the bonds of the Publishing Company, made an application for leave to intervene, and also moved that the trial be re-opened to permit the alleged majority to submit evidence of their claims and alleged rights. While the case was still under advisement, that is to say, April 13, 1935, the court, by order, re-opened the case for the taking of further evidence. And on that day the court denied the application of the Protective Committee for leave to intervene, and also denied the motion of trustees Boor and Robinson to dismiss the Board's suit to foreclose the trust mortgage.

April 26, 1935, E. V. Reed, Henry Hackman, Herman Werle, Neil McKenzie, D. D. Wilkinson, and John Eifer, as alleged owners and holders of $550 par value of the bonds of the Publishing Company, filed an application for leave to file a complaint in intervention, which application was, by an order of the court, denied May 3, 1935.

Between the time the case was tried and submitted in December, 1934, and April 13, 1935, the date the case was reopened to take further evidence, the Publishing Company delivered to certain persons who had theretofore signed said exchange agreements, bonds of the Publishing Company which it had received at the time the exchange agreements, respectively, were signed, and had held since in its safe, and obtained from such persons a return of the preferred stock, which the Publishing Company had delivered to said persons at the time said exchange agreements were signed and said bonds delivered to and received by the company.

July 15, 1935, findings of fact and conclusions of law were filed pursuant to which decree was entered for the foreclosure of the trust mortgage, from which the Protective Committee, the E. V. Reed group of alleged bondholders whose application to intervene was denied, and trustees Robinson, Boor, and Wurtz prosecute a joint and several appeal, and the Publishing Company and the Holding Company, separate appeals.

Respondent Board moves for a dismissal of the appeal of the Protective Committee upon the grounds: That the Committee, and the persons the committee claims to represent, are not parties to the suit, and that such appeal was not taken within the time required by statute. Upon the same grounds the Board moves also for dismissal of the appeal of the E. V. Reed group of alleged bondholders whose application to intervene was denied. The Protective Committee and the Reed group claimed an interest in the matter in litigation between the Board and the Publishing Company by reason of the alleged ownership of certain bonds of that company, and based their right to intervene upon the alleged ownership of such bonds.

If an order denying an application for leave to file a complaint in intervention (made under section 5–322, I. C. A.)

is a final judgment and, therefore, appealable, then the motion of the Board to dismiss said appeals must be granted, because neither the Protective Committee nor the Reed group appealed from such order within 90 days after entry, or at all. They appealed from the decree of foreclosure. Therefore, the motions to dismiss present the question: Are the orders, respectively, of the trial court denying the respective applications of the Protective Committee and the Reed group for leave to file complaints in intervention, final judgments within the definition of section 7–701, I. C. A.? That section reads:

"*Judgment defined.*—A judgment is the final determination of the rights of the parties in an action or proceeding."

 An application for leave to intervene in pending litigation presents but one question: The *right* of the applicant to intervene. An order denying such an application must necessarily be final because, having once passed upon that question, there is nothing further the trial court could possibly do in the premises. A decision that is conclusive of any question is final as to that question. (*Howe v. Key System Transit Co. et al.*, 198 Cal. 525, 246 Pac. 39, 42; *Dollenmayer et al. v. Pryor*, 150 Cal. 1, 87 Pac. 616. See, also, *Commercial Block Realty Co. v. United States Fidelity & Guaranty Co.*, 83 Utah, 414, 28 Pac. (2d) 1081, 1082; *Ryan v. McKinley*, 124 Cal. App. 765, 13 Pac. (2d) 522; *Stern & Goodman Inv. Co. v. Danziger et al.*, 206 Cal. 456, 274 Pac. 748.) We conclude that an order denying an application to intervene is a "final judgment" within the meaning of section 7–701, *supra*. The motions to dismiss are granted and said appeals are dismissed.

And the Board moves also for a dismissal of the appeal of trustees Robinson, Boor, and Wurtz upon the grounds: That Robinson, Boor, and Wurtz are respondents and are represented by A. L. Anderson, of Nampa, and Hallock, Donald & Banta, of Baker, Oregon; that said Robinson, Boor, and Wurtz are not parties to the suit except as members of the Board of Trustees named in the trust mortgage, of which Board trustee W. W. Deal is also a member.

Section 11–103, I. C. A., provides:

572

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

*"Who may appeal—Designation of parties.*—Any party aggrieved may appeal in the cases prescribed in this code. . . . . "

▮▮ ▮▮ Robinson, Boor, and Wurtz appeal from the decree of foreclosure as "trustee interveners" (not as bondholders nor otherwise than trustees). They do not point out wherein or how they, or either of them, as such "trustee interveners," were injuriously affected by the entry of the decree from which they appeal. In fact, no brief has been filed by such trustees in opposition to the motions to dismiss. These trustees, together with trustee W. W. Deal, constituting a majority of the Board of Trustees, created by the trust mortgage, sought and obtained leave to file, and filed, a complaint for the foreclosure of the trust mortgage. The trial court granted the Board the precise relief it sought, to wit, foreclosure of the trust mortgage. A party not aggrieved by a judgment has no right of appeal therefrom. (*Northern Pac. Ry. Co. v. Idaho County*, 34 Ida. 191, 200 Pac. 128.) Furthermore, Robinson, Boor, and Wurtz having appealed as trustees, and in their representative capacity only, their rights, if any, as bondholders or otherwise, are not before this court. Therefore, the motion to dismiss the appeal of trustees Robinson, Boor, and Wurtz is granted and the appeal dismissed.

We come now to a consideration of the separate appeals of the Publishing Company and the Holding Company. These appeals will be discussed in the order stated.

The Publishing Company contends that Poage's appointment as sole trustee was void *ab initio*; that, at the time the Board sought and obtained leave to file a complaint in intervention for the foreclosure of the trust mortgage, no legal suit for the foreclosure of the mortgage was pending; that "intervention can take place only when there exists a legal action pending between two persons"; that "one cannot intervene by 'joining with the plaintiff' when the plaintiff has no legal existence and is not a legal person, and has been discharged"; and that "where an action as originally begun is a mere nullity, there can be no substitution of parties."

As we understand the Publishing Company, it contends that inasmuch as the proceedings for the appointment of Poage as

trustee were void *ab initio*, there was no suit pending into which the Board could intervene; that inasmuch as Poage had been discharged before the Board's complaint was filed, there could be no substitution; that, consequently, there was no legal suit pending for the foreclosure of the trust mortgage, and for that reason the court was without jurisdiction of the subject of the suit and for the same reason the court was without jurisdiction of the parties, and that as to the Publishing Company in particular, it was not in court.

It will be observed that the Publishing Company does not challenge the jurisdiction of the district court to hear and determine the general class of cases to which the suit at bar belongs—jurisdiction which can be conferred only by law and which cannot be either conferred or waived by litigants. Its challenge, apparently, as above stated, goes to the jurisdiction of the court over the litigants, both plaintiffs and defendants, as well as to jurisdiction of the particular subject of the suit, based upon the contention that there was no legal suit pending at the time the Board filed its complaint for the foreclosure of the trust mortgage. Therefore, we are not confronted here with an absence of jurisdiction which could not be conferred by the parties by their own acts and conduct. Did the court, then, in any manner, acquire jurisdiction of the subject of the suit at bar and of the parties? In determining that question, it is wholly immaterial that the complaint in foreclosure was termed a "complaint in intervention." The moment the complaint in foreclosure was filed, the jurisdiction of the court attached to the subject of the suit, and by the filing of the complaint the trustees, constituting a majority of the Board, submitted themselves, in their representative capacity, respectively, to the jurisdiction of the court. Consequently, the court acquired and had jurisdiction of the subject of the suit and of the persons of the plaintiffs suing in their representative capacity as trustees. But to complete the jurisdiction of the court it must have acquired jurisdiction of defendant Publishing Company. Jurisdiction of the person of a defendant may be acquired by a voluntary appearance, without the service of process. Did the trial court so acquire jurisdiction of the Publishing Company?

Turning to the record we find that the Board filed its complaint in foreclosure August 15, 1934; that thereafter, September 4, 1934, the Publishing Company demurred to the complaint upon the sole ground that the debt evidenced by the bonds mentioned and described in paragraph VII thereof was barred by the statute of limitations. Consequently, the demurrer constituted a voluntary general appearance by which the Publishing Company submitted itself to the jurisdiction of the court without reservation, which made the jurisdiction of the court complete. Moreover, after the court overruled its demurrer, the Publishing Company filed an answer to the Board's complaint in foreclosure. By its answer it joined numerous nonjurisdictional grounds of defense with alleged jurisdictional grounds. This court held in *Central Deep Creek Orchard Co. v. C. C. Taft Co.*, 34 Ida. 458, 202 Pac. 1062, that a joinder of nonjurisdictional with jurisdictional grounds constitutes a general appearance. And participation in the trial of the Board's suit to foreclose the trust mortgage by examining and cross-examining witnesses, constituted a general appearance. (*Miller v. Prout*, 33 Ida. 709, 713, 197 Pac. 1023; *Pittenger v. Al. G. Barnes Circus*, 39 Ida. 807, 811, 230 Pac. 1011.) Finally, if a party wishes to insist upon the objection that he is not in court, he must keep out for all purposes except to make that objection. (*Pingree Cattle Loan Co. v. Webb & Co.*, 36 Ida. 442, 446, 211 Pac. 556; *Pittenger v. Al. G. Barnes Circus, supra*; *American Surety Co. v. District Court*, 43 Ida. 589, 598, 254 Pac. 515; *Burrows v. Burrows*, 10 Cal. App. (2d) 749, 52 Pac. (2d) 606.) The Publishing Company failed to do that, as hereinbefore pointed out.

Eliminating from consideration, for the moment, all of the grounds above-mentioned, which appear to so clearly sustain the jurisdiction of the district court, there is another ground upon which jurisdiction can be sustained, for instance: The record shows the filing of a complaint for the foreclosure of the trust mortgage by trustee Poage, and that the Publishing Company was thereafter served with process and that it later filed a general demurrer to the trustee's complaint, thus submitting itself to the jurisdiction of the court. The record also shows that the order appointing Poage

trustee was annulled and Poage discharged before the Board filed its complaint, as contended by the Publishing Company, but in that connection the record further shows that the court did not dismiss the suit commenced by Poage (as trustee) for the foreclosure of the trust mortgage; it merely discharged him. That was the situation when trustees Boor, Robinson, Wurtz, and Deal filed an application for leave to file a complaint in intervention for the foreclosure of the trust mortgage. And, while the order granting that application was designated an "Order granting leave to amend," such order was, in legal effect, an order of substitution, from which it follows that the order was mistakenly designated an order granting leave to amend. (See *Demarrias et al. v. Burke et al.*, 50 S. D. 353, 210 N. W. 198.)

We turn now to a consideration of the appeal of the Publishing Company on its merits. No doubt the trial court denied the application of the Protective Committee and Reed groups to intervene upon the general rule that trustees represent all bondholders. But the facts in the instant case take it out of the general rule. Here we have an unusual contest between bondholders. One set, composed of Arant and Mainwaring, claims ownership of a majority of the bonds of the Publishing Company, and another set, composed of two groups (the Reed group and the group represented by the Protective Committee), claims that it owns a majority of the bonds of the company. Arant and Mainwaring contend that the opposing set exchanged its bonds for preferred stock of the Publishing Company and, therefore, that it does not own any of the bonds of the company. On the other hand, the Protective Committee and Reed groups contend that the contemplated exchange was never actually consummated and, consequently, that they own and hold a majority of the bonds of the Publishing Company; that there can be no foreclosure until a majority of the beneficiaries demand it; that the trustees have no authority, without their consent, as alleged owners of a majority of the bonds, to foreclose under the powers contained in the mortgage, nor any duty, power, or right to apply to a court of equity for a foreclosure.

The trial court found that $8,300 worth, face value, of the bond issue had been taken up and canceled by the company by delivering in exchange therefor preferred stock in the company, and that in determining who held the majority of the outstanding bonds and were consequently entitled to direct the trustees in the matter of foreclosure proceedings, said $8,300, face value, of retired bonds should be excluded from the total, which left Arant and Mainwaring owners and holders of a majority of the remaining unpaid bonds. The court failed to find, however, as to whether or not the agreement, under which these bonds were received and canceled, and for which preferred stock was issued, had ever been complied with, as to amount and time, so as to render the contract, under which this exchange was made, legal and binding on the parties.

It seems that the $8,300, face value, of stock was delivered over to the company under a written agreement as follows:

"This agreement shall be in effect when the party of the first part shall have obtained the signatures of the owners of not less than 75% of the outstanding bonds of Co-operative Publishing Company, to this or similar agreements, and in the event the party of the first part shall fail to obtain the signatures of 75% of the owners of such outstanding unpaid bonds before July 1, 1932, this agreement shall be void and of no effect and the party of the first part shall return to the party of the second part the bond or bonds deposited herewith."

No finding was made as to whether or not "the owners of not less than 75% of the outstanding bonds of the Co-operative Publishing Company" ever signed this agreement or surrendered their bonds in accordance with the terms thereof. Unless the holders of seventy-five per cent of the outstanding bonds signed up in accordance with this agreement, a cancelation of any bonds surrendered under such agreement would not be binding upon the owners thereof. A finding on this subject was essential to the entry of a decree in the case under the theory on which the trial court proceeded, namely, that the holders of the majority of the outstanding bonds were entitled to direct the action of the trustees in the prosecution of the suit.

For the purposes of the prosecution of this suit, under the facts as herein stated, it is immaterial as to who actually owned or controlled a majority of the unpaid outstanding bonds of the company. The majority could not prevent the foreclosure or delay the suit so that the statute of limitations would bar a recovery or release the security to the prejudice of any bondholder. It would be not only the privilege, but the duty, of the trustees to proceed with the suit, in a case like this, where the indebtedness was of long standing (more than fifteen years) and the defendant (the debtor) was pleading the bar of the statute of limitations (sec. 5–216, I. C. A.), as was done in this cause. By the same answer, by which the bar of the statute of limitations was pleaded, the defendant was praying "for an order dismissing this action," for the reason, as alleged, that commencement thereof · was not authorized by direction of the holders of a majority of the outstanding bonds. This contention was made under authority of the following stipulation contained in the trust mortgage:

"If default shall be made in the payment of said bonds or any of them, or the interest thereon, according to the tenor and effect of said bonds and coupons, or in any other of the covenants, stipulations, agreements or conditions herein or in any of said bonds specified and by said party of the first part to be kept or performed, and such default in the payment of said interest shall have continued for said period of thirty (30) days, then the principal indebtedness represented by all of said bonds may, at the election of said trustees, and shall, upon written request of the holders of a majority in amount of the outstanding bonds, become immediately due and payable, and the said trustees may, in their discretion, and shall upon written request of the holders of a majority in amount of said outstanding bonds and upon receiving proper security for costs, expenses and attorneys fees, take immediate steps for the foreclosure of this mortgage by action in a court of competent jurisdiction or by affidavit of notice and sale as provided by the laws of the State of Idaho. *It is further agreed that any such suit or action shall be subject to the control of such majority in amount of the bondholders,*

*and it shall be lawful at any time before sale of the property, for such majority to direct the trustees in writing to waive such default or breach and dismiss any suit theretofore brought for the foreclosure of this mortgage, and to vacate any judgment or decree therein obtained, on such terms as they may direct, and such waiver shall not be a bar to the right of said trustees or bondholders, or any of them, to proceed in like manner in the event of any subsequent default.''* (Emphasis ours.)

That kind of stipulation, in some form or other, is not uncommon to trust deeds and mortgages, and yet an examination of the authorities leads to the conclusion that courts of equity are disposed to construe such provisions with strictness.

''Clauses of this character, restrictive of the common-law right of a creditor, who holds a plain obligation of his debtor, are not favored in law, and must be strictly construed.''

(*Bullowa v. Thermoid Co.*, 114 N. J. L. 205, 176 Atl. 596; *Noble v. European Mortgage & Investment Corp.*, 19 Del. (Ch.) 216, 165 Atl. 157, 159; 2 Jones on Bonds, etc., sec. 811.)

It will be observed that the italicized portion of the foregoing stipulation, contained in the deed of trust, provides that any suit or action shall be subject to the control of a majority in amount of the bondholders; and that it shall be lawful for them to direct the trustees to waive default or breach and to *dismiss* any suit theretofore brought for the foreclosure of the mortgage, or to vacate any judgment or decree. This provision, however, cannot be construed to give the holders of a majority of the bonds the right to destroy the security of the minority bondholders or to extend to the point of releasing or discharging the indebtedness. If it were intended that such stipulation should grant such an arbitrary power to the holders of the majority of the bonds, it would be void and a court of equity would disregard it.

In considering a similar stipulation contained in a trust deed, in *New York Trust Co. v. Michigan Traction Co.*, 193 Fed. 175, 180, the court said:

''The trustee, independently of the provisions of the trust deed, has the power, and it is its duty, whenever the necessity arises, to invoke the aid of a court of equity to preserve

the trust estate, and this power cannot be abridged or restricted even by agreement of the parties. *Old Colony Trust Co. v. City of Wichita,* (C. C.) 123 Fed. 762; *Guaranty Trust Co. v. Green Cove Springs Co.,* 139 U. S. 137, 11 Sup. Ct. 512, 35 L. Ed. 116.''

In a very exhaustive opinion by Justice Lurton in *Toler v. East Tennessee, V. & G. Ry. Co.,* 67 Fed. 168, 179, 180, in considering a kindred stipulation in a railroad trust deed, the court said:

''If the provisions of the mortgage concerning foreclosure were subject to the construction that they are exclusive of all right to resort to a court of equity, then they would be invalid, as intended to oust the jurisdiction of the courts, which, by the uniform current of authority, cannot be done. . . . . The trustee must exercise judgment and discretion, having regard to the general interests of the trust. Where there are differences of opinion among the bondholders as to what their interests require, the trustee must judge between them. In such case 'it is not improper that he should be governed by the voice of the majority, acting in good faith and without collusion, if what they ask is not inconsistent with the provisions of the trust.' ''

*Weir v. Bauer,* 75 Utah, 498, 286 Pac. 936, is a very instructive case on the subject of these restrictive or directory stipulations, reserving to the majority the right to direct and control the proceedings for the collection of bonds. In that case, notwithstanding a stipulation authorizing the majority to direct the foreclosure proceedings and all litigation in connection with the collection of the obligation, the court recognized the right of the minority to maintain the action, saying:

''Any demand made on Bauer, the majority holder of the bonds, for his written request to the trustee, or his consent, to bring an action of any kind for a foreclosure or collection of the bonds likewise would have been unavailing, for it was within the power of Bauer to grant or withhold his consent, not for the good or benefit of all bondholders, for the good of both the plaintiff and Bauer, but as best suited the purpose and advantage of Bauer who was in discord with the plaintiff. To have required such demand in the

circumstances and obtain the consent of Bauer as a condition precedent to bringing the action would not have been unlike a situation where one was required to go to another hostile to him and obtain his consent that he might be sued to have their differences adjusted. While Bauer testified that he at all times was willing to keep the bonds alive as valid and existing obligations by extending their maturity or time of payment, yet he, from the commencement of the action to the end of it, was opposed to the institution of any proceeding for the foreclosure of the trust deed, or for the collection of the bonds, notwithstanding no interest had been paid on them since 1917. . . . . The case thus is not one where such restrictive provision in the trust deed is to be given effect for the better protection and security of all outstanding bondholders, but one where the provision is resorted to and asked to be given effect for the gain and advantage of the majority holders and to the prejudice and injury of the minority. To thus hold the restrictive provision effective is to deny the plaintiff all remedy to vindicate and protect his rights in the premises, and to oust jurisdiction of the courts. We therefore are of the opinion that the plaintiff had the right to maintain the action.''

It is, however, important to those whose bonds had been returned by them, under the agreement, and thereafter canceled for preferred stock, that the court hear the evidence and make findings as to whether the agreement, under which such bonds were returned and the preferred stock issued in lieu thereof, had been lived up to and carried out, to the effect that the holders of seventy-five per cent of the outstanding unpaid bonds should sign up the agreement, return their bonds and accept preferred stock in lieu thereof. It would be patently unfair to these bondholders to have their bonds canceled as paid and receive in lieu thereof preferred stock from an insolvent company, and then allow the other bondholders to have their bonds paid *pro rata* out of the assets realized from the sale of the property, without prorating with the bondholders whose stock had been thus canceled, unless it be found as a fact that the terms on which they agreed to such surrender and cancelation have been strictly complied with.

██ It is not denied that at one time the Protective Committee and the Reed groups owned certain bonds of the Publishing Company. Whether they are still owners of such bonds depends upon whether said exchange agreement was signed by the owners of seventy-five per cent of the outstanding bonds of that company. Where, as here, there is a serious dispute as to whether the owners of seventy-five per cent of outstanding bonds actually signed the exchange agreement, the parties composing said groups should be brought into court as defendants, in order that that question may be fully and fairly presented and adjudged in the regular way. (*Toler v. East Tennessee, V. & G. Ry. Co., supra.*)

██ ██ Next for consideration comes the appeal of the Holding Company. It appears that after the trust mortgage was given, the Publishing Company acquired certain personal property, to wit, office furniture, fixtures, and equipment. The Holding Company contends the trust mortgage does not cover such after-acquired property. The trial court held that all the personal property acquired by the Publishing Company after the execution and delivery of the trust mortgage was covered by that instrument, except a cash register, five typewriters, and three stoves. Just what after-acquired property is covered by the trust mortgage depends upon the intention of the parties as expressed by the provisions of the instrument covering and describing the property intended to be mortgaged. Those provisions are as follows:

''All of the following described property of which the said party of the first part (Co-operative Publishing Company) is the owner, and of which it is possessed, or may hereafter acquire, consisting of a complete printing plant and machinery known at (as) the Co-operative Publishing Company's printing plant and business, including subscription list, good will, paper stock now on hand, inks and materials, also all type, type cabinets, stones, galleys, metal and wood furniture, all machinery, consisting of one Linotype No. 4, with equipment, one Whitlock press, one Cottrell press, one C. & P. paper cutter, one Mentge folder, one Success stitcher, one 8x12 and one 10x15 C. & P. job presses, one Standard perforator, motors, belting and shafting, together

with such new machinery, printing presses, linotypes, and such other equipment, now being installed or hereafter to be installed, to the extent of the interest of the said party of the first part therein, all office furniture and fixtures and shop fixtures, and all other equipment used in connection with such business.''

It will be seen that the first provision reads: ''All of the following described property of which the said party of the first part (Co-operative Publishing Company) is the owner, and of which it is possessed, or may hereafter acquire.'' Then follows a description of the personal property then owned by the Publishing Company. If it had been intended to mortgage only the property at that time owned by the Publishing Company, the parties would have described that property and stopped, because, in that case, there would have been no need for adding anything whatever. But we find after these words: ''All of the following described property of which the said party of the first part (Co-operative Publishing Company) is the owner, and of which it is possessed,'' the following: *''or may hereafter acquire.''* (Emphasis ours.) From which it seems perfectly clear that the parties intended that the trust mortgage should cover not only the property then owned by ·the Publishing Company but all personal property which it might thereafter acquire. It is sufficient where, as here, the intention of the parties that after-acquired property should be covered by the mortgage and held as security for the debt, is manifest from the language of the instrument. (*Dover Lumber Co. v. Case,* 31 Ida. 276, 285–287, 170 Pac. 108; *Hudson v. Kootenai Fox Farms Co.,* 47 Ida. 58, 65, 272 Pac. 704.)

The judgment is affirmed as to appellant Holding Company. The judgment against the Publishing ·Company is reversed and the cause is remanded for the purpose of bringing in said parties and enabling the trial court to hear further evidence, and to make specific findings as to what amount of the outstanding bond issue was signed up by the owners and holders thereof, under the stipulation whereby it was agreed that the owners of seventy-five per cent of the outstanding bonds would surrender up their bonds and take preferred stock in lieu thereof, and ascertain and determine

whether or not the said agreement was strictly complied with. If the court finds that the agreement was complied with, then *all the bonds delivered under such agreement* should be considered paid and deducted from the total outstanding bonded indebtedness. If, on the other hand, the agreement was not complied with, the bonds so covered by the exchange agreement should be dealt with and considered as outstanding bonds and still the property of the owners who surrendered the same under said agreement; and the decree should cover the total bonded indebtedness and the proceeds from the sale of the property should be prorated among all the holders of such obligations.

Costs awarded to appellant Publishing Company.

Ailshie and Givens, JJ., concur.

Morgan, C. J., deeming himself to be disqualified, did not sit with the court at the hearing nor participate in the opinion.

Budge, J., did not participate.