665 P.2d 1093

**IDAHO BANK & TRUST COMPANY, a corporation, Plaintiff-Appellant,**

v.

**CARGILL, INCORPORATED, a corporation, Defendant-Respondent.**

No. 14038.

Court of Appeals of Idaho.

June 21, 1983.

William A. Parsons of Parsons, Smith, Stone & Fletcher, Burley, for plaintiff-appellant.

Donald J. Chisholm of Goodman, Duff & Chisholm, Rupert, for defendant-respondent.

SWANSTROM, Judge.

Idaho Bank & Trust Co. made a series of loans to Floyd Idle, a grain dealer at Rupert, Idaho. Some of the loans had not been repaid when Idle declared bankruptcy in 1977. The bank sought payment of the unpaid loans from Cargill, Inc., under the theory that Cargill was an "account debtor" who had wrongfully made several payments to Idle on grain contracts, the proceeds of which Idle had assigned to the bank as security. When Cargill refused to accept liability for the bank's losses, the bank brought this suit. Following trial, the district court held that the bank did not have a security interest in the disputed contracts and entered judgment for Cargill. We affirm.

Broadly phrased, the issue is whether Cargill, having paid Idle on certain grain contracts, should be compelled to pay again—this time to the bank—for failing to honor the assignment. The answer to this question depends on whether Cargill was an "account debtor" with respect to the disputed contracts. To decide this question, we must address two legal issues. Did Idle and the bank have a written security agreement meeting the minimum requirements of I.C.

§ 28–9–203? Did the parties' security agreement apply to "future advances" and "after-acquired collateral"?

The facts giving rise to this case are for the most part undisputed. Idle's business consisted of purchasing grain from farmers and reselling it to large, west coast grain concerns, such as Cargill, Inc. and Lees-Carney & Co. Early in 1974, Idle had obtained a $50,000 line of credit with the bank. His line of credit was unsecured, and the bank was unwilling to increase the credit limits without collateral for the loans. As a result the bank made a new loan committment to Idle.

The bank agreed to loan Idle 80% of the face value of the grain contracts he made with Cargill and Lees-Carney in exchange for an assignment of contract proceeds, as security for the loans. The only document the bank and Idle used to evidence this arrangement was entitled an "Assignment" prepared by the bank and signed by Idle. It reads as follows:

KNOW ALL MEN BY THESE PRESENTS: That I, Floyd Idle dba Idle Warehouse the undersigned, of Minidoka County, Idaho, for value received, do hereby set over, assign and transfer all monies now due or to become due under certain Grain Contracts held in your Warehouse. All checks are to be made payable to Idle Warehouse and Idaho Bank & Trust Company. Mail all checks to Box 604, Rupert, Idaho, 83350.

Floyd E. Idle

Floyd E. Idle dba Idle Warehouse

In November of 1974, the bank sent a copy of the assignment both to Lees-Carney and to Cargill. Accompanying the document was a letter giving notice that Idle had assigned to the bank "all funds due him from the sale of grain to your Corporation" and requesting that the bank be listed as a joint payee on all future checks. On December 2 Cargill acknowledged receipt and acceptance of the assignment. This was the last communication between the bank and Cargill until the end of April, 1977.

The bank began lending additional money to Idle pursuant to the new arrangement.

At Idle's direction Cargill placed the bank's name and Idle's name on each grain contract that Idle made with Cargill. Idle would bring these contracts to the bank and obtain advances from the bank of up to 80% of the cash value of each contract, by executing a promissory note for the amount of each advance. In all, the bank made short term loans on approximately two hundred contracts. When paying the contracts on which the bank's name appeared Cargill placed the bank's name as a joint payee on the checks. Cargill mailed these checks to Idle who took them to the bank. The bank routinely endorsed the checks for deposit to Idle's account and computed the amount of any loan then due. Idle wrote his check to the bank for the amount then due on his loans.

For two years the scheme appeared to work smoothly. Trouble began in early 1977 when the bank cut off Idle's line of credit. In response, Idle temporarily stopped performing the contracts on which he had received advances from the bank. Instead, he entered into a new series of grain contracts with Cargill. Idle directed Cargill not to put the bank's name on these contracts and Idle did not use them to obtain loans. In payment of these contracts, Cargill issued checks to Idle in his name alone. After performing seven of these contracts, Idle resumed performance of the contracts on which the bank had loaned money. However, he directed Cargill to scratch the bank's name off these remaining contracts and to issue checks without the bank's name as a co-payee. In all, Cargill issued checks to Idle for $77,667.34 on which the bank's name did not appear. These checks were issued in payment of five grain contracts on which the bank had loaned money to Idle in 1977.

In the spring of 1977, Idle went bankrupt. Idle defaulted in repayment of five promissory notes leaving him approximately $56,-000 in debt to the bank. The bank sued Cargill on the theory that Cargill was an "account debtor" as that term is used in the Uniform Commercial Code. The bank contends that as an account debtor Cargill

should be held liable for the losses the bank sustained when Cargill, in disregard of the notice sent by the bank, paid the proceeds of the grain contracts to Idle. The bank claimed that if Cargill had obeyed the assignment the bank would have received sufficient funds to cover Idle's $56,000 debt. This likewise is the theory of liability the bank advances on appeal.

It is obvious the bank intended Idle's assignment would provide security for loans the bank made to Idle. Accordingly, I.C. § 28–9–102(1)(a) provides that Chapter 9—"Secured Transactions" of our Uniform Commercial Code—shall apply. Both the bank and Cargill have cited this chapter as the applicable law. However, the parties' citations have sometimes been to the statutes and official comments to the code as they existed at the time of trial rather than to the ones which were in effect at the time of the transactions.[1]

The basic premise on which the bank stakes its claim against Cargill is well established. The Indiana Supreme Court in *Ertel v. Radio Corporation of America*, 307 N.E.2d 471, 473 (1974), stated it as follows:

> Section 9–318(3) [of the UCC] clearly delineates the legal relationship between the account debtor and the assignee once the account debtor receives adequate notification of an assignment. The account debtor, upon receipt of said notification, is duty-bound to pay the assignee and not the assignor. Payment to an assignor, after notification of assignment, does not relieve the account debtor of his obligation to pay the assignee unless the assignee consents to such a collection process. (See official comment # 3, 9–318.) The account debtor's failure to pay the assignee after receiving due notification gives rise to an assignee's claim for wrongful payment.

The rule is the same in Idaho. *See Bank of Commerce v. Intermountain Gas Co.*, 96 Idaho 29, 523 P.2d 1375 (1974).

The dispute in this case focuses upon whether Cargill was an account debtor in respect to certain contracts coming into existence after the assignment was given. The district court determined that the assignment contained neither a "future advances" clause nor an "after-acquired property" clause. The court concluded as a matter of law that the assignment did not contain a description of the collateral sufficient to create a security interest in the proceeds of contracts which did not come into existence until 1977. The court also held the assignment did not protect the bank with respect to advances made by the bank in 1977.

Underlying the court's reasoning is the assumption that the relationship of assignee to account debtor does not come into existence unless the assignee has a security interest in the subject of the assignment. In other words, where, as here, the assignment is used as a security device, the mere fact of assignment, even coupled with notice, does not suffice to create the relationship of assignee to account debtor. There must be an underlying security interest. This conclusion of the trial court is supported by the language of the code.

Former I.C. § 28–9–105(1)(a) defined "Account debtor" as "the person who is obligated on an account, chattel paper, contract right or general intangible." Official Comment No. 2 to that section stated in part: "Where the *collateral* is an account, contract right, chattel paper or general intangible the original obligor is called the 'account debtor'. . . ." [Emphasis added.] "Collateral" was defined in former I.C. § 28–9–105(1)(c) as "the property subject to a *security interest*, and includes accounts, contract rights and chattel paper which have been sold." [Emphasis added.] It is implicit from these definitions and comments that an obligor's legal status as an "account debtor" comes into being only when the assigned "contract rights" are

---

1. Throughout this opinion our references to the code will be to statutes as they existed between 1967 and 1979. In 1967 Idaho adopted provisions of the 1962 Uniform Commercial Code and in 1979 enacted substantial amendments in accordance with the 1972 Uniform Commercial Code.

collateral subject to a security interest. The code extends no protection to an assignee if a security interest has not attached to the assigned contract rights.

■ A security interest is not enforceable against the debtor or third parties unless certain minimal requirements are met. Where, as here, the collateral is not in the possession of the secured party, there must be a security agreement signed by the debtor containing a description of the collateral. Value must be given and the debtor must have rights in the collateral. Former I.C. §§ 28–9–203, 9–204. What concerns us here is whether the assignment given by Idle to the bank met the code's requirement for a written security agreement. We must also determine whether the language in the assignment was adequate to secure future advances with after-acquired collateral.

■ Courts have often repeated that no magic words are necessary to create a security interest and that the agreement itself need not even contain the term "security interest." This is in keeping with the policy of the code that form should not prevail over substance and that, whenever possible, effect should be given to the parties' intent. For example, former § 28–9–102 provided in part as follows:

[T]his chapter applies ... to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including ... contract rights;

This chapter applies to security interests created by contract including pledge, assignment ... or consignment intended as security....

One court noted "there must be language ... in the instrument which when read and construed leads to the logical conclusion that it was the intention of the parties that a security interest be created." *In re Nottingham,* 6 U.C.C.Rep.Serv. 1197, 1199 (Bankr.E.D.Tenn.1969). *See also First County National Bank & Trust Co. v. Canna,* 124 N.J.Super. 154, 305 A.2d 442, 444 (N.J.Super.1973).

In each of the following two cases the court found that assignment language, standing alone, was sufficient to create a security interest in favor of the assignee. *See In re Munro Builders, Inc.,* 20 U.C.C. Rep.Serv. 739, 740–41 (Bankr.W.D.Mich. 1976) and *Citizens & Southern National Bank v. Capital Construction Co.,* 112 Ga. App. 189, 144 S.E.2d 465, 466 (Ga.App.1965). We conclude that the document satisfied the requirement of I.C. § 28–9–203(1) that there be a written security agreement.

■ Former I.C. § 28–9–203(1)(b) also required that the security agreement contain a description of the collateral. To satisfy this requirement, "any description of personal property ... is sufficient whether or not it is specific if it reasonably identifies what is described...." I.C. § 28–9–110. The official comment to this section makes it clear that the policy of the code with regard to this provision is quite liberal. The comment urges courts to reject the view contained in older chattel mortgage cases that descriptions of collateral are "insufficient unless they are of the most exact and detailed nature." In this case the assignment describes the collateral as "all monies now due or to become due under certain Grain Contracts held in your Warehouse." We believe that this description minimally meets the requirements of I.C. § 28–9–110 as to any grain contracts existing between Idle and Cargill at the time Cargill received notice of the assignment. As the comment to that section notes, "the test of sufficiency of a description laid down by this section is that the description do the job assigned to it—that it make possible the identification of the thing described."

■ The question remains, does the assignment give the bank a security interest in "after-acquired collateral," that is, proceeds of contracts entered into by Idle and Cargill subsequent to the assignment? Under former I.C. § 28–9–106 the collateral, which the bank claims in this case, was defined as a "Contract right," meaning "any right to payment under a contract not yet earned by performance and not evi-

denced by an instrument or chattel paper." Former I.C. § 28–9–204(3) stated that "a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement."[2] The comments to this section make it clear that a security interest arising by virtue of an after-acquired property clause is no longer a disfavored arrangement. As specified in this section a security interest will attach in such collateral when value has been given and when the contract has been made. Nevertheless, to protect the interests of debtors, creditors, purchasers and other interested persons, some definiteness and clarity must be imparted by the security agreement itself. As one commentator observes:

It is essential that the security agreement contain an after-acquired property clause when it is intended to bind after-acquired property; and if the security agreement fails to do so the security interest of the creditor does not extend beyond the property described in the security agreement.

4 Anderson, Uniform Commercial Code § 9–204:9, p. 181 (1971).

We find little to assist us—in reported Idaho cases—in determining whether the language used in the assignment was sufficient to create a security interest in after-acquired collateral. The latest case dealing with this issue, *Whitworth v. Krueger*, 98 Idaho 65, 558 P.2d 1026 (1976), did not interpret similar language. In *Whitworth* the court was concerned whether the word "replacements" in a cattle sale agreement between sellers and buyers gave the sellers a security interest in certain after-acquired cattle coming into possession of the buyers. In a specially concurring opinion, written by Justice McFadden in which two other justices joined, the court said:

As a general rule, creation of an after-acquired right does not demand the use of any special language.

"It is not necessary that the security agreement or the financing statement

use the words 'after-acquired property.' Where a reasonable man, looking at the description of the collateral, would recognize that it was intended to extend to *replacements or additions,* the security interest will have that effect." (Emphasis added.) Anderson U.C.C., Vol. 4, p. 181, § 9–204:9 (1971).

98 Idaho at 72, 558 P.2d at 1033. Moreover, in the same opinion the majority rejected the notion that a prior leading Idaho case (*Poage v. Co-operative Pub. Co.,* 57 Idaho 561, 66 P.2d 1119 (1937)) sets forth any "minimum standard" by which language, purporting to create a security interest in after-acquired collateral, may be tested today. We are, therefore, left with the language of the code as it existed in Idaho at the time, the official comments to that code, and cases from other jurisdictions to aid in our interpretation of the assignment.

Section 28–9–110 of the code provides in part: "For the purposes of this chapter any description of personal property . . . is sufficient whether or not it is specific if it reasonably identifies what is described. . . ."

The official comment to this section notes:

The test of sufficiency of a description laid down by this section is that the description do the job assigned to it—that it make possible the identification of the thing described. Under this rule courts should refuse to follow the holdings, often found in the older chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called "serial number" test. . . .

In the present case the bank argues that the language used in the assignment gave the bank a security interest in the proceeds of all contracts on which it loaned money to Idle during the course of their two-year relationship. Moreover, the bank contends that provisions of the assignment, coupled

**2.** Former § 28–9–204 was repealed in 1979, and was replaced by a new section. Now, § 28–9–204(1) provides: "Except as provided in subsection (2), a security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral."

with the course of dealing between Idle and the bank, make it obvious that the assignment was also intended to apply to future as well as present loans made by the bank.

■ We are not persuaded by the bank's argument. Whatever the parties may have intended, their intent is not clearly expressed by the assignment. The phrase "all monies now due or to become due under certain Grain Contracts held in your Warehouse" hardly encompasses the collateral to which the bank lays claim—the proceeds of five contracts entered into by Cargill and Idle in early 1977. The quoted language could reasonably be construed to mean monies due and coming due on *existing* contracts, at the time of the assignment in 1974. Moreover, this construction of the language is consistent with provisions of the U.C.C. as it existed at the time of these transactions. An example of this is the comment to the official text under former § 9–106. It states that " 'Contract right' is a right to be earned by future performance under an *existing contract*." [Emphasis added.] *See also* Comment No. 2 to § 28–9–318. We agree with the trial court that the assignment did not reasonably identify or describe the after-acquired collateral, that is, Idle-Cargill contracts not then in existence. *But compare Valley National Bank of Arizona v. Flagstaff Dairy,* 116 Ariz. 513, 570 P.2d 200 (Ariz.App.1977) ("all monies due or to become due debtor from the sale of milk" held sufficient to include accounts receivable earned after the date of the security agreement).

■ The assignment was similarly inadequate in providing security for future advances. There is absolutely no mention in the assignment of future advances. Under former I.C. § 28–9–204(5) "obligations covered by a security agreement may include future advances." Official Comment No. 8 to this section stated that in pre-code law there was a "vaguely articulated prejudice against future advance agreements." The comment goes on to observe, however, that § 9–204 "validates the future advance interest, *provided only that the obligation be covered by the security agreement.*" [Em-

phasis added.] This comment has been interpreted to mean that "to cover future advances, the security agreement must clearly specify that the security interest in the collateral is meant to secure future advances." *Texas Kenworth Co. v. First National Bank of Bethany,* 564 P.2d 222, 225 (Okl.1977). We agree with this interpretation. Absent a clause in the security agreement which clearly covers future advances, such advances do not fall within the scope of the agreement. It thus cannot reasonably be argued that the assignment extended protection to the bank for all the advances it made to Idle in the two years after its execution.

The bank argues that the "course of dealing" and "course of performance" of the parties should be considered in construing the scope and meaning of the assignment. Indeed, the code provides that a course of dealing between parties may "give particular meaning to and supplement or qualify terms of an agreement." I.C. § 28–1–205(3). Likewise, § 28–2–208(1) provides that where a "contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." *See also* I.C. § 28–1–201(3).

■ We have already related the course of conduct which occurred during the two years after notice of the assignment was given. There was no communication between the bank and Cargill. Idle alone dealt with Cargill and all of Cargill's checks were mailed to Idle.

As mentioned earlier, in late 1976 the bank suspended its loan commitment, while it pondered whether a renewed commitment would be made. At the bank's request Idle reduced his loan balance to zero around December 1. The bank nevertheless made several additional loans to Idle upon contracts that Idle brought to the bank between December 6, 1976, and February 16, 1977. On February 16 Idle learned the

bank would make no more loans. Idle then stopped having Cargill place the bank's name on his contracts. Idle even instructed Cargill to strike the bank's name from some contracts previously entered into, but which neither Idle nor Cargill had then performed. When Idle did deliver grain on these contracts, Cargill made payment to Idle. These are the payments the bank seeks to recover from Cargill.

The bank argues that, by reason of Cargill's conduct in providing joint payment checks over a long period of time, we should construe the assignment to cover future advances and we should hold that Cargill had notice of the true nature of the security agreement between Idle and the bank. However, Cargill was not a party to the assignment and played no part in selecting the language employed by the bank to create its security interest in the Idle-Cargill contracts. Idaho Code § 28–9–201 provides in part that "except as otherwise provided in this act, a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." In addition, subsection (3) of 9–318 provided:

> The account debtor is authorized to pay the assignor until the account debtor receives notification that the account has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor.

Cargill, as much as anyone, had a right to rely on the assignment language, in determining whether it could safely follow Idle's request to discontinue issuing joint payment checks after the bank terminated Idle's former line of credit. Nothing in the 1974 assignment indicated it was to cover future advances made by the bank. We are therefore not persuaded that any legal or equitable principles require us to construe the assignment so as to cover loans made by

the bank after the date of the assignment. To do so would not, in our view, be consistent with the stated policies of the U.C.C. "to simplify, clarify and modernize the law governing commercial transactions." I.C. § 28–1–102. *Texas Kenworth v. First National Bank of Bethany, supra.* See also *Safe Deposit Bank and Trust Co. v. Berman,* 393 F.2d 401 (1st Cir.1968).

■ In summary, we hold that the assignment was adequate to create a security interest in existing contracts. However, after-acquired collateral was not reasonably identified or described. The assignment created no security interest in the after-acquired collateral and it did not cover future advances. An examination of the course of performance by the parties does not reveal legal or equitable reasons to construe the language against Cargill. We conclude that Cargill was not an account debtor with respect to the proceeds in question. Thus, Cargill cannot be held liable to the bank under I.C. § 28–9–318(3) for breaching the assignment by paying the proceeds of these contracts to Idle rather than to the bank. Having reached this conclusion, we need not discuss other alleged errors of the trial court relating to computing the bank's losses and the cause of those losses. Accordingly, we affirm the judgment. Costs, but no attorney fees to respondent.

WALTERS, C.J., concurs.

BURNETT, Judge, concurring specially.

I concur in the result. However, I respectfully submit that the Court's opinion addresses more issues than are necessary to dispose of this appeal. I write separately to explain my narrower view of the case.

The essential facts may be restated briefly. In 1974, a grain seller (Idle) began borrowing money from a bank (Idaho Bank & Trust). As security he assigned his right to proceeds of grain sale contracts with a grain buyer (Cargill). A cursory instrument combining the assignment and notice of the assignment was drafted by the bank. It was signed by the seller, and a copy was sent to the buyer. It said simply and un-

ambiguously that the assignment was "for value received." It referred only to money due or to become due under "certain Grain Contracts held in your Warehouse." The bank made several loans to the seller, identifying each loan to a particular contract. All loans made upon contracts in existence at the time of the 1974 assignment were repaid.

During 1975 and 1976, the bank made additional loans to the seller, upon contracts which came into existence after the assignment. The seller asked the buyer to put the bank's name on checks in payment of these contracts. The trial court found that this request was made voluntarily by the seller, who had authority in his dealings with the bank to direct the proceeds of the grain sales. The buyer was given no reason for the seller's request, but acquiesced in it. All of the loans related to these subsequent contracts were fully repaid.

In late 1976 and 1977, the bank again loaned the seller money on particular contracts. For simplicity, these contracts may be termed the "1977 contracts." On several of these occasions, the seller requested the buyer not to put the bank's name on checks in payment of the contracts. The trial court found that the seller was at liberty to revoke his earlier request in this regard. Again, the buyer acquiesced and issued checks on several 1977 contracts payable solely to the seller. The seller went bankrupt without fully repaying the 1977 loans related to these contracts. The bank sued the buyer for wrongful payment on the theory that the assignment in 1974 covered proceeds of the 1977 contracts.

These facts invoke application of the principle, arising from the general law of contracts, that an obligor under an assigned contract owes a duty of performance to the assignee only when the obligor has received notice of the assignment. *See generally* S. Williston, A Treatise on the Law of Contracts (Jaeger 3rd ed. 1960), § 433. A corollary flowing from this principle is that the notice must tell the obligor what performance is due to the assignee. This corollary has been incorporated into the Idaho's Uniform Commercial Code, which requires that the notice to the obligor "reasonably identify the rights assigned." I.C. § 28–9–318(3). A notice which fails to satisfy this requirement is ineffective.

In the present case I would hold that the assignment and cover letter drafted by the bank in 1974 failed to "reasonably identify" any right to proceeds of contracts not then in existence. They said nothing about after-acquired collateral, nor about any future advances to which such collateral might pertain.

The bank asserts that the assignment was enlarged, and that notice was commensurately broadened, when the seller asked the buyer to put the bank's name on checks during 1975 and 1976. However, the record discloses no communication to the buyer linking this request to the 1974 assignment. The bank urges, in essence, that broadened notice be imputed to the buyer because the seller's request should have put the buyer on inquiry concerning the scope of the assignment. However, I do not believe that I.C. § 28–9–318(3) authorizes such a result. I read the statute to require that an assignee make its rights known to the obligor. If the assignee could satisfy this requirement merely by putting an obligor on inquiry, the language providing that a notice "reasonably identify the rights assigned" would be eviscerated.

I conclude that the proceeds of the 1977 contracts did not fall within any rights of the bank reasonably identified in a notice to the grain buyer. Absent effective notice covering these contracts, the buyer was entitled to perform the contracts by paying the seller. The buyer did, in fact, fully perform. The trial court correctly decided that the bank was not entitled to compel the buyer to pay twice for the same grain.