TILLEY v. ALLIED MATERIALS CORPORATION.

No. 35056. March 17, 1953.

Rehearing Denied May 12, 1953.

*256 P. 2d 1110.*

434

Wayne W. Bayless and Charles L. Orr, Oklahoma City, for plaintiff in error.

Richardson, Shartel & Cochran, F. M. Dudley, and J. G. Rucks, Oklahoma City, for defendant in error.

O'NEAL, J. The question here presented is whether Orville Tilley is entitled to 1/4 of 7/8 of the first oil produced from two oil and gas leases under a recorded drilling contract asserted to be superior to the rights of a subsequent mortgagee and the purchasers of the leases under the foreclosure sale.

The plaintiff below will be referred to as "Tilley" and the defendant, Allied Materials Corporation, as "Allied."

On April 17, 1939, Allied was the owner of an oil and gas lease known as the "Louis Tipken" lease covering 80 acres in Lincoln county, Oklahoma. Allied was also the owner of an oil and gas lease known as the "Henry Tipken" lease covering 80 acres in said county and state. On said date, Allied entered into a written contract with A. A. Thornton to drill one well on a 40-acre tract on each of said separate leases; and for the drilling of said wells Allied agreed to assign to Thornton 40 acres out of each of said 80-acre tracts, subject to a 1/8 overriding interest in the gas produced from each lease, and subject to a reservation of 15,000 barrels of oil out of 1/4 of 7/8 of the oil produced from each of said leases. Thornton was required to sell Allied the oil so produced for a minimum period of two and one-half years at 50 cents per barrel.

On May 2, 1939, Thornton employed Tilley, a well driller, to drill one well on each of said 40-acre leases for a cash consideration and an oil payment of $30,000 "to be paid out of the first oil produced from an undivided 1/4 of 7/8 working interest of the two 40-acre oil and gas leases." The contract was recorded on August 8, 1939.

Tilley completed a well on the Louis Tipken lease in July, 1939, producing oil in very substantial quantities. Thereafter, in September, 1939, he complied with his contract by drilling a well on the Henry Tipken lease, which well produced gas only.

On June 22, 1939, Allied, in compliance with its contractural obligations, thereupon assigned 40 acres out of the Louis Tipken lease to Thornton, reserving the overrides of 1/8 of the gas, 15,000 barrels of oil and the right to purchase the oil as provided in Allied's contract with Thornton.

From and after the time the Louis Tipken well became a producer of oil,

Allied received its reserved 15,000 barrels of crude and ran the oil from the lease. As the purchaser of the crude it paid royalties to the owners, overriding interest and the oil payments in conformity with the provisions of the various contracts of record, save and except as hereinafter referred to.

On June 29, 1939, Thornton assigned to Yorkan Production Corporation his interest in the Louis-Tipken lease, subject to his contract of April 17, 1939, with Allied and subject to an overriding royalty of 1/8 of gas and casinghead gas produced in favor of Allied and subject to the oil payment to Tilley, out of 1/4 of 7/8 of the first oil produced from the Louis-Tipken lease.

In September, 1939, after Tilley had drilled the gas well on the Henry Tipken lease, as he was required to do under his contract of May 2, 1939, with Thornton, Allied assigned the Henry Tipken lease to Yorkan Production Corporation, Thornton's nominee, with certain reservations not here involved.

On July 25, 1939, Tilley executed a division order which authorized Allied to credit Tilley "oil payment of $15,000.-00 in favor of Orville Tilley, out of 1/4 of 7/8 working interest from the Louis Tipken lease."

On August 22, 1939, Yorkan Production Corporation executed certain mortgages covering both leases to secure loans and advancements made by Eugene L. Garey, which mortgages were subject to a payment of $15,000 out of 1/4 of 7/8 of oil produced from the Louis-Tipken lease, and the obligations of Yorkan to pay drilling costs of well on the Henry Tipken lease, all mortgages being subject to the terms of the April 17, 1939, contract between Allied and Thornton. The gas well was thereafter completed in September, 1939.

On March 9, 1940, Yorkan Production Corporation and Tilley advised Allied, by letter, that the division order of July 25, 1939, covering productions of oil from the Louis Tipken well was erroneously executed and claimed it should

have included and covered the production of gas and casinghead gasoline, in addition to the oil.

On the same date the Yorkan Production Corporation executed certain assignments to Tilley, authorizing the payment to him out of 1/4 of 7/8 working interest of both oil and gas from the Henry Tipken lease until Tilley shall have received the sum of $8,250 in lieu of his right to an oil payment of $15,000.

On the same date Yorkan Production Corporation executed an assignment to Tilley authorizing the payment to him out of 1/4 of 7/8 of the working interest from both oil and gas out of the Louis Tipkin lease until Tilley shall have received the full sum of $15,000.

The evidence of Paul Brown, secretary and attorney of Yorkan Production Corporation, and also attorney for Thornton, clearly establishes that the two instruments referred to under date of March 9, 1940, were prepared by him in an effort to compromise and settle the claim of Tilley that he should receive payments from gas, as well as from oil, from the respective leases. The attempted compromise and settlement to include payments out of gas, as well as oil, were not approved or recognized by Allied, the purchaser of the production of oil from the Louis Tipken lease, or thereafter when Allied became the owner of the leases under the foreclosure sale.

To sustain the judgment rendered below, Allied contends that (1) the drilling contract under which Tilley contends that he is entitled to payment of $30,000 out of 1/4 of 7/8 of the first oil produced from the Louis Tipken lease is ambiguous and was given a practical construction by the parties upon which they acted and relied and the court was justified in giving such construction controlling effect in construing or interpreting the contract; (2) in the foreclosure action cause No. 18194 in the district court of Pottawatomie county, the court decided plaintiff's claim adversely to him; hence, under the principle of res judicata, the same can-

not be opened, considered or retried in the instant action.

The answer under Allied's first contention depends upon the force and effect of the drilling contract between Thornton and Tilley. Thornton, having acquired the "farmed-out" contract from Allied, entered into a contract with Tilley, under date of May 2, 1948. This contract obligated Tilley to drill two wells; one on the Louis Tipken lease and one on the Henry Tipken lease, for a cash consideration and a $30,000 oil payment to be paid out of 1/4 of the 7/8 of the first oil produced from said leases. Tilley contends that as the Louis Tipken lease produced oil, that this lease was obligated to pay the full $30,000 oil payment out of the 1/4 of 7/8 of the first oil produced therefrom after he had completed his contract by drilling both wells. To fortify his contention he calls attention to the following sentences in the contract of May 2, 1939. The first sentence fixing the amount of the oil payment of $30,000 and providing that it be paid from the first oil produced from the leases reads as follows:

"In addition to said sums of money the second party shall be paid the sum of Thirty Thousand Dollars ($30,000.00) out of the first oil produced from an undivided one-fourth of the seven eighths working interest out of the two forty-acre oil and gas leases above referred to" (Louis Tipken lease and Henry Tipken lease).

The second sentence contains a provision which reduced the oil payment under the contingencies therein recited. The sentence reads as follows:

"It being understood, however, that if for any reason the Second Party does not drill the second well, (Henry Tipken lease) that then the oil payment he is entitled to receive shall be reduced to Fifteen Thousand Dollars ($15,000.00) out of the first oil produced from an undivided one-fourth interest in the forty-acre tract on which the first well is drilled." (Louis Tipken lease.)

The third sentence of the contract provides that Thornton might change the location of the second well if the first well should not prove to be a commercial producer. That sentence reads as follows:

"It being further understood that if for any reason the first well that is drilled does not prove to be a commercial producer in the judgment of First Party, he may elect to move the location of the second well to some other location on the forty-acre tract or on some other lease in the vicinity of said well and if said second well is thus moved to some other location, the oil payment herein provided shall come out of the two wells so drilled, regardless of their location."

The fourth sentence of the contract provides for the execution and delivery of oil payments as the wells were completed, but did not change either the amount or source of the $30,000 oil payment for the drilling of the wells. That sentence reads as follows:

"Said oil payments are to be executed and delivered to the Second Party upon the completion of each well; that is the first oil payment to be executed and delivered to Second Party when the first well is completed and the second oil payment to be executed and delivered to the Second Party when the second well is completed."

(Tilley is the second party referred to in the quoted paragraphs of the contract.)

As we construe this contract, Tilley, after drilling the two wells, was entitled to receive the $30,000 oil payment from 1/4 of 7/8 of the first oil produced from the wells drilled; that if the second well drilled by him on the Henry Tipken lease did not produce oil, but produced gas, he had a call upon the oil produced from the Louis Tipken lease for the full amount specified in his drilling contract.

We do not agree with Allied's contention that the division order executed by Tilley setting up his oil payment of $15,000 out of 1/4 of 7/8 of the working interest out of the Louis Tipken lease evidenced any intention by Tilley to

abandon his rights established under his drilling contract with Thornton. When this division order was executed the second well had not been drilled. Moreover, it is unreasonable to assume that after drilling the first well as an oil producer, he would abandon the benefits of his contract in failing to drill the second well, and thereby deprive himself of the full oil payment of $30,000. The fact that the first well when completed came in as a good producer would be a sufficient incentive to drill the second well, in the reasonable expectation of accelerating the liquidation of his $30,000 oil payment.

Neither can we subscribe to Allied's contention that Tilley's oil payment was to be limited to a $15,000 oil payment out of one well if the second well failed to become a producer. This theory assumes Tilley should be burdened with the cost and expenses of drilling a dry hole. The contracting parties specifically foreclosed such a conclusion by providing that if the first well does not prove to be a commercial producer, Thornton could call on Tilley to drill a second well, and if the second well became a producer "the oil payment herein provided shall come out of the two wells so drilled, regardless of their location." It follows that if the second well failed to become a producer, the first well was obligated to pay the full oil payment. The contract provides for an oil payment, not for oil payments. We find no ambiguity in the contract with reference to the amount or the conditions under which the oil payment became due and payable.

Allied did not plead that the Thornton-Tilley drilling contract was ambiguous, nor did it offer proof in support of an alleged ambiguity, but limited its defense under an assertion that Tilley was only entitled to receive $15,000 out of 1/4 of 7/8 working interest from the first well drilled and having paid said $15,000 out of the production from the first well, its liability under the contract ceased. The trial court found the drilling contract to be free from ambiguity and stated:

"The law of Oklahoma certainly makes this contract clear."

The court's finding of facts in this respect was correct, but the court's conclusion of law, we think, was erroneous.

We held in Coston v. Adams, 203 Okla. 605, 224 P. 2d 955, as follows:

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is ascertainable and lawful."

In Mid-Continent Petroleum Corp. v. Blackwell Oil & Gas Co., 159 Okla. 35, 15 P. 2d 1028, we said:

"The intention of the parties to a contract must be deduced from the entire agreement and not from any part or parts of it, and where a contract has several provisions, the intention of the contracting parties is not expressed by any single clause or provision, but by every part and provision of it."

In Popplewell v. Jones, 202 Okla. 185, 211 P. 2d 283, we held:

"'The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties thereto as expressed therein, and give effect to the same, if it can be done consistently with legal principles. In arriving at the intention of the parties to a contract, the language used therein, if it is clear and explicit, and does not involve an absurdity, governs in the interpretation."

Allied asserts that Tilley concurred in the construction which Allied says should be given the Thornton-Tilley contract, that is, that Tilley was only entitled to one payment of $15,000 out of 1/4 of 7/8 working interest of oil produced from the Louis Tipken lease. That contention is not supported by any evidence that we are able to discover in the record. Tilley at all times contended that the oil payment was to come out of both wells, if and when both wells were drilled. When he signed the division order on July 25, 1939, covering the first well, the second well had not been drilled. The gas well was not completed until September, 1939, and, therefore,

neither of the contracting parties gave any consideration to whether the oil payment was to come out of one well or two wells, or whether the payment was to come out of both oil and gas from said wells. When the gas well came in on the Henry Tipken lease Tilley discovered for the first time that the drilling contract gave him a call for an oil payment, but not from gas. Tilley brought an action to reform the contract to include payment out of gas production. In an effort to compromise that suit, two instruments were executed providing for a reduced oil and gas payment from the Henry Tipken lease and an oil and gas payment of $15,000 out of the Louis Tipken lease. These instruments were to become effective only if Eugene L. Garey would subordinate his mortgage upon the leases to include the gas payment. This Garey refused to do.

Allied contends that Tilley in his pleadings in the Pottawatomie county suit limited his oil payment to $15,000 to the Louis Tipken well. The record does not bear out Allied's contention. Copies of the pleadings filed by Tilley in the Pottawatomie case disclose that the only question raised by him was that his contract with Thornton of May 2, 1939, by mutual mistake, failed to include gas, as well as oil, out of the $30,000 oil payment to be paid. The journal entry of judgment in that case discloses that the court specifically approved the report of the Referee to the effect that the oil payment should come out of gas as well as oil from the production of both leases, subject only to the right of Eugene L. Garey under his mortgage from Yorkan. That judgment in no manner foreclosed Tilley's rights to the oil payment under his recorded contract with Thornton. The priority of Garey's mortgage upon appeal was affirmed by this court in Garey v. Rufus Lillard Co., 196 Okla. 421, 165 P. 2d 344. The judgment in the Pottawatomie case, upon which Allied relies, foreclosed all the right, title and interest of Yorkan Production Corporation in the leases. Yor-

kan's interest was inferior to Tilley's interest, as Yorkan acquired its interest in the leases subject to Tilley's recorded contract.

We said in McNeal v. Baker, 135 Okla. 159, 274 P. 655, as follows:

"In construing the judgment of a court, effect should be given to every word and part thereof, including such effects and consequences that follow the necessary legal implications of its terms, although not expressed."

This rule was approved in Russell v. Freeman, 202 Okla. 417, 214 P. 2d 439.

As we view the pleadings, the report of the Referee and the judgment of the court in the Pottawatomie suit, the judgment did not assume to foreclose Tilley's rights to the oil payment, and, furthermore, no exceptional circumstances were alleged or established in that proceeding authorizing the court to render the judgment claimed to have been rendered by Allied.

We held in State ex rel. Com'rs of Land Office v. Reynolds, 201 Okla. 400, 206 P. 2d 184; Hester v. Watts, 203 Okla. 97, 218 P. 2d 641, and in Noble v. Kahn, 206 Okla. 13, 240 P. 2d 757, as follows:

"In an action to foreclose a real estate mortgage, if plaintiff desires to bring within the jurisdiction of the court and litigate an outstanding title or interest which on the face of the record is a valid paramount title, the plaintiff should allege the facts upon which he seeks to have his mortgage decreed to be a lien on such apparent paramount title."

Allied's counsel admits in his brief that the Pottawatomie judgment foreclosing Tilley's oil payment might have been erroneously entered, but asserts that if it is erroneous, the judgment binds Tilley, and, therefore, the judgment is res judicata, and in support of that contention relies upon Talley v. Harris, Ex'r, 199 Okla. 47, 182 P. 2d 765. In that case this court held that while the judgment rendered was erroneous, it was not void. The court had

jurisdiction over the parties and the subject matter of the action. It had jurisdiction to pass upon the question there presented. It had power and authority to render the particular judgment in question.

A careful reading of the case discloses that the court had jurisdiction of the subject of the action. The subject matter of the action there involved was whether an antenuptial contract entered into between a man and woman in contemplation of their marriage will be enforced and thereby deprive the widow of a widow's allowance out of her deceased husband's estate. It is apparent that the force and effect of the antenuptial contract was specifically pleaded and relied upon to defeat the widow's claim to participate in her deceased husband's estate.

In the Pottawatomie case which Allied relies upon as res judicata, the pleadings did not draw in question whether Tilley was entitled to the $30,000 oil payment out of the Tipken well or out of both wells, or whether the Louis Tipken well was solely liable to an oil payment of $15,000. Nor was the jurisdiction of the court invoked to construe the legal effect of the Tilley-Thornton contract, but its jurisdiction was only invoked to decide whether by reason of the mutual mistake of the parties they had failed to include gas as a source from which the Tilley payments should be made. On this issue the court found in favor of Tilley. The journal entry of judgment states:

"It is Further Ordered, Adjudged and Decreed by the Court that the contract of Orville Tilley (Claim #61 of the Revised Report of the Referee) for the drilling of wells upon the Louis Tipken and Henry Tipken leases, and payment therefor, should be and the same is hereby reformed to provide for the payment of said Orville Tilley, under said contract, of the sum of Fifteen Thousand Dollars ($15,000.00) to be paid out of an undivided one-fourth of the production of the gas as well as the oil accruing to the Henry and Louis Tipken leases herein described, but that

such reformation shall not be made to be effective prior to the first, second and third mortgage liens of Eugene L. Garey."

Jurisdiction of a court is of three kinds: (1) jurisdiction of the parties; (2) jurisdiction of the general subject matter; and (3) jurisdiction of the particular matter which the judgment professes to decide.

We held in Standard Savings & Loan Ass'n v. Anthony Wholesale Grocery Co., 62 Okla. 242, 162 P. 451, as follows:

"A judgment, which is entirely outside of the issues in the case and upon a matter not submitted to the court for its determination, is a nullity, and may be vacated and set aside at any time on motion of a party, or any person affected thereby. And any collateral or subsequent proceeding dependent upon the validity of such judgment may, in like manner, be vacated upon proper motion by any person affected thereby."

This court in its opinion refers to its earlier decisions in Anglea v. McMaster, 17 Okla. 501, 87 P. 660, wherein the territorial court announced a similar rule.

In our recent decision in Bishop v. Franks, 188 Okla. 196, 107 P. 2d 358, we held:

"A judgment, or any portion thereof, which is entirely outside the issues and upon a matter not submitted to the court for determination, is erroneous."

In Hester v. Watts, supra, and in State ex rel. Com'r of Land Office v. Reynolds, supra, we held that in a proceeding to foreclose a mortgage wherein the mortgagee alleges that certain named defendants claim some interest or title to the property, but which is inferior to the mortgagee's title, does not plead facts justifying a judgment canceling a prior recorded title in the land. Moreover, the Garey mortgage and the suit of foreclosure thereon recited that the mortgage was subject to the contracts between Allied and Thornton, the reservations of Allied and the

"unpaid balance of the oil payment to Orville Tilley out of the Louis Tipken lease and the obligations of Yorkan to pay the drilling contractor for drilling the well on the Henry Tipken lease."

When Allied purchased the leases under the foreclosure sale, it acquired only the title of Yorkan. As we have seen, Yorkan's title was subject to the oil payment of Tilley.

Allied continued making the oil payment to Tilley out of the production of the Louis Tipken well from June, 1939, to July 1946, in the sum of $15,000. When Allied discontinued further payment Tilley contacted the president of Allied and demanded that the oil payment be continued as per his drilling contract. The only reply he received was that the matter would have to be turned over to Allied's lawyers.

The judgment is reversed, with instructions to enter judgment for Tilley for the balance due under his drilling contract to be paid out of 1/4 of 7/8 working interest of oil produced from the Louis Tipken well, the judgment to carry interest at 6% from the date such payment became due and payable.

HALLEY, C. J., JOHNSON, V. C. J., and WILLIAMS and BLACKBIRD, JJ., concur. CORN and DAVISON, JJ., dissent.