TEXAS KENWORTH COMPANY, a Texas Corporation, d/b/a Oklahoma Kenworth Company, Appellee,

v.

FIRST NATIONAL BANK OF BETHA-NY, a National Banking Association, Appellant.

No. 48170.

Supreme Court of Oklahoma.

May 3, 1977.

Rehearing Denied June 1, 1977.

John T. Edwards, Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, for appellee.

Peter G. Pierce, III, Carson & Trattner, Oklahoma City, for appellant.

DAVISON, Justice:

Appellee, Texas Kenworth Company, brought a conversion action against the appellant, First National Bank of Bethany, alleging that the Bank had converted the proceeds realized at the sale of four trucks. Both parties involved in the appeal were secured creditors who had perfected security interests in the four trucks sold, by virtue of their dealings with debtor, Paul Sewell, owner of the Paul Sewell Trucking Company. As the proceeds realized at the sale of the four trucks were not sufficient to make whole either of the secured creditors, the creditor having priority is entitled to all the proceeds from the sale. The complete details of the complex business transaction involved are not germane to the issue of priority, therefore need not be discussed here. The basic facts germane to the issue of priority are as follows:

(1) In March, 1969, Texas Kenworth Company engaged in the business of selling and repairing truck tractors, sold four Kenworth Trucks to debtor Sewell. Four separate security agreements were executed, one for each truck, and four separate security interests were perfected.

(2) In August, 1971, First National Bank of Bethany made a loan to debtor Sewell, taking a security interest in all equipment now owned or hereinafter owned by the debtor.

(3) In 1972, both the Bank and Kenworth entered into other business transactions with debtor Sewell in which both the Bank and Kenworth took security interests in the four trucks involved in the litigation.

All the security interests involved were perfected by filing. Since none of the special Sections on priority are applicable, 12A O.S.1971 § 9–312(5) is controlling. That Subsection provides in part:

"In all cases not governed by other rules stated in this section * * *, priority between conflicting security interests in the same collateral shall be determined as follows:

(a) in order of filing if both are perfected by filing, regardless of which

security interest attached first under Section 9–204(1) and whether it attached before or after filing; * *."

■ A security interest created under the Uniform Commercial Code does not necessarily reflect a static relationship between the debtor and the secured party. The relationship between the parties may be made flexible in two ways: (1) the amount of the collateral which is subject to the security agreement may increase or decrease, and (2) the indebtedness with which the collateral is charged may vary. Accordingly, any security agreement may include an after acquired property interest, a future advance interest, or both.

In the case now before us, since both secured creditors perfected by filing, the secured creditor who first files has priority over the other secured creditor. Since Kenworth perfected by filing first, it would appear that Kenworth had priority. However, the record reflects that the 1969 security agreements only charged the four trucks with Sewell's debt for the purchase price of the trucks and related cost, and that those debts had been satisfied when the Bank took possession of the trucks. Kenworth argues that the 1969 security agreements also charged the four trucks with future advances made to Sewell. If this is the case, Kenworth will be entitled to first priority because Sewell's debts to Kenworth, arising out of subsequent transactions of the same type, have not been satisfied. The question before us is whether the 1969 security agreements subjected the collateral, the four trucks, to future advances made to Sewell.

Title 12A O.S.1971 § 9–204(5) provides:

"Obligations *covered by a security agreement may include future advances* or other value whether or not the advances or value are given pursuant to commitment." [Emphasis added]

Comment 8 of the Uniform Commercial Code under § 9–204 provides:

"Under subsection (5) collateral may secure future as well as present advances *when the security agreement so provides.*

At common law and under chattel mortgage statutes there seems to have been a vaguely articulated prejudice against future advance agreements comparable to the prejudice against after-acquired property interests. Although only a very few jurisdictions went to the length of invalidating interests claimed by virtue of future advances, judicial limitations severely restricted the usefulness of such arrangements. A common limitation was that an interest claimed in collateral existing at the time the security transaction was entered into for advances made thereafter was good only to the extent that the original security agreement specified the amount of such later advances and even the times at which they should be made. In line with the policy of this Article toward after-acquired property interests this subsection validates the future advance interest, *provided only that the obligation be covered by the security agreement. . . .*" [Emphasis added]

In his treatise, *Security Interests in Personal Property*, Professor Gilmore discusses Section 9–204(5) in light of Comment 8. Professor Gilmore states:

"Article 9 puts no express limitation on the validity of future advance arrangements. Section 9–204(5) provides: 'Obligations covered by security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment'. The relevant Comment, after referring to the 'vaguely articulated prejudice against future advance agreements' under prior law, remarks that 'this subsection validates the future advance interest, provided only that the obligation be covered by the security agreement'.

"It is not entirely clear what the phrase 'covered by a [the] security agreement', which appears in both text and Comment, means. Nor is it clear that the phrase is used in the same sense in its two appearances. The Comment seems to suggest that the phrase is a limitation: any future advance agreement is valid, *provided*

that it is somehow 'covered by the security agreement'. The only apparent meaning of the phrase, if it is taken as a limitation, is that *there must be a clause in the security agreement which clearly provides for future advances. Absent such a clause, future advances would not be 'covered'*; a new loan would require a separate security agreement. Such a limitation would indeed be in line with the pre-Code case law. It is much less clear from the text than it is from the Comment that the phrase is used as a limitation; in the text it could easily be read as merely descriptive, meaning no more than 'any secured obligation.' The reading suggested by the Comment is, however, a plausible construction of the text, even if it is not the only possible one." 2 Gilmore, Security Interests in Personal Property (1965), Pages 931–932. [Emphasis added and footnotes omitted]

Professor Gilmore's conclusion, that in order for a security agreement to cover future advances, the security agreement must clearly specify that the security interest in the collateral is meant to secure future advances, has received judicial acceptance.[1]

■ After considering the wording of Subsection (5) and Comment 8, we, like Professor Gilmore, are persuaded that in order for a security interest to subject the collateral to future advances, the security agreement must clearly indicate that the obligation covered includes future advances.

The 1969 Security Agreements upon which Kenworth relies, do not specifically indicate that the obligations covered by the Security Agreements include future advances. In each of the 1969 Security Agreements, the buyer's obligation is set forth as follows:

"BUYERS OBLIGATION. Buyer agrees to pay the TIME BALANCE to Seller, or its assignee, at its office as follows:

One payment of $947.50 due April 1, 1969. Then $815.00 due on the 1st day of each month for eight (8) months starting May 1, 1969. Then $815.00 due on the 1st day of each month for 10 months starting March 1, 1970. Then $815.00 due on the 1st day of each month for 13 months starting March 1, 1971. No monthly payments in the months of January and February 1970 and Jan. and February 1971."

Section 7 of the Security Agreements provides the obligation also includes certain *expenses* incurred by the seller, if they are incurred.

The section of the Security Agreements upon which Kenworth relies in claiming that the agreements provided for future advances is Section 1., which provides:

"TITLE RETENTION—OBLIGATION TO MAKE PAYMENTS. Title to the purchased Collateral shall not pass to the Buyer until all payments hereunder and all other charges required to be paid by the Buyer hereunder, including late and collection charges, if any, *and all other indebtedness from Buyer to Secured Party are fully paid.* No transfer, renewal, extension or assignment of any interest under this contract, and no loss or destruction of the Collateral shall release the Buyer from his obligation under this Agreement." [Emphasis added].

■ The precise issue before us is whether the emphasized language, "all other indebtedness from Buyer to Secured Party" is sufficient to encompass future advances in the obligation under the contract. We hold

1. See e. g., *In Re Rivet* (DC Mich. Referee Bankruptcy) 4 UCCRS 1087 (1967), in which the Bankruptcy Referee stated:

"Had the security agreement made provision for future advances, then it could have made the several ͞advances or 'loans' subsequent to the first one with continued perfected security.

\*    \*    \*    \*    \*    \*

In the instant case, the lander failed to provide in the underlying security agreement for security against the collateral based on future advances."

Also see *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.*, 3 UCCRS 1112 (Rhode Island 1966); *In Re Galwe*, 6 UCCRS 876 (DC Wis. Referee Bankruptcy 1969); and *In Re Taylored Products, Inc.*, 5 UCCRS (DC Mich. Referee Bankruptcy 1968).

that it is not. In attempting to persuade this Court that the emphasized language is sufficient to encompass future advances, Kenworth puts great emphasis upon two cases: *John Miller Supply Co., Inc. v. Western State Bank*, 55 Wis.2d 385, 199 N.W.2d 161 (1972); and *In Re Public Leasing Corporation*, 488 F.2d 1369 (10th Cir. 1973). The fact patterns in both of those cases can be easily distinguished from the fact pattern before us. In both cases upon which Kenworth relies, the language of the security agreements indicated that the collateral involved was to act as security for future as well as present debts. In *In Re Public Leasing Corporation*, supra, the security agreement provided in part:

"Buyer agrees that 'Seller' retains title to equipment purchased hereunder and is granted a security interest in any additional security collateral described herein, as well as any accessions or accessories added thereto, all of which is hereafter referred to as the collateral, as security for the payment of said time balance, and also for any and all liabilities of Buyer to 'Seller' *now existing* or *hereafter incurred.*" [Emphasis added] 488 F.2d 1369 at 1375.

In *John Miller Supply Co., Inc.*, supra, the security agreement provided in part:

"     *     *     *

"(f) 'OBLIGATIONS' means all Debtor's *present and future debts*, obligations and liabilities to Bank of whatever nature." [Emphasis added] 199 N.W.2d 161 at 162.

In the case before us however, the language of the Security Agreements nowhere indicates that the collateral is to secure future, as well as present, debts and liabilities. Indeed, we have found no cases in which a court has upheld a future advance provision of a security agreement where the language of the agreement did not somehow indicate that the collateral was meant to secure future as well as present obligations.

Title 12A O.S.1971 § 9–201 provides:

"Except as otherwise provided by this Act a security agreement *is effective according to its terms* between the parties, against purchasers of the collateral and against creditors." [Emphasis added]

The Security Agreements relied upon by Kenworth do not specifically state either directly or indirectly that the collateral was to secure future indebtedness or future advances. This being the case, we will not construe the agreements as subjecting the collateral to future advances, for great uncertainty would be introduced into the law of security agreements by interpreting such contracts as open-end agreements.[2]

Lender, Kenworth, places great emphasis upon the facts that the purpose of the Uniform Commercial Code is "notice filing." However, the underlying security agreements determine the validity of a creditor as a secured party. For example, if there is no valid security agreement, the mere filing of a financing statement does not create a secured transaction. We also point out that potential creditors who do inquire should be able to rely upon the security agreement itself in determining what obligations are secured. Creditors reading the Security Agreements now before us could not reasonably be expected to interpret the agreements as securing future advances. Accordingly, our interpreting the agreements as securing future advances would not be appropriate, for it would introduce uncertainty, which is contra to one of the stated purposes of the Uniform Commercial Code, which is to clarify the law governing commercial transactions.[3]

Therefore, we hold that the language in the Security Agreements before us did not have the effect of securing future advances.

---

**2.** See *Safe Deposit Bank and Trust Company v. Berman*, 393 F.2d 401 (1st Cir. 1968).

**3.** 12A O.S.1971 § 1–102(2) provides:

"(2) Underlying purposes and policies of this Act are

(a) to simplify, *clarify* and modernize the law governing commercial transactions;
*   *   *."

Because the 1969 Security Agreements did not secure future advances, and because all debts due and payable to Kenworth except for future advances had been satisfied when the Bank took possession of the proceeds, the 1969 Security Agreements were no longer in effect when the trucks were repossessed by the Bank. When the Bank repossessed the trucks, its 1971 Security Agreement entitled it to priority over the collateral and its proceeds.

■ Kenworth puts some emphasis upon the fact that the filed financing statements, filed at the time the 1969 Security Agreements were made, were never released. We attach no significance to such fact, for a creditor is under no duty to release a financing statement merely because a debt has been satisfied. The Uniform Commercial Code Comment following 12A O.S.1971 § 9–406, which deals with release of the financing statements, makes it clear that there is no duty to file a release. The Comment provides:

> "Like the preceding Section, this Section provides a *permissive device* for noting of record any release of collateral. There is no requirement that such a statement be filed when collateral is released. * * *. It is merely a method of making the record reflect the true state of affairs so that fewer inquiries will have to be made by persons who consult the files." [Emphasis added]

■ Unless a written demand by the debtor sent to the creditor, pursuant to 12A O.S.1971 § 9–404, makes a demand, there is no duty on behalf of the creditor to file a release or termination statement. Conversely, there is no duty on the part of the debtor to make a written demand.[4] Since there is no duty to file a release or termination statement, unless requested, and since there is no duty to make such a request, we attach no significance to the fact that no release or termination statement was filed.

For the above stated reasons, we hold that the Bank, at the time it took possession of the trucks, was entitled to possession by virtue of its security interest. Accordingly, we hold that the Bank was not guilty of conversion. Therefore, we reverse the decision of the trial court.

REVERSED.

HODGES, C. J., LAVENDER, V. C. J., and WILLIAMS, IRWIN and BERRY, JJ., concur.

BARNES and DOOLIN, JJ., dissent.

4. 12A O.S.1971 § 9–404:

"(1) Whenever there is no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value, the secured party must on written demand by the debtor send the debtor a statement that he no longer claims a security interest under the financing statement, which shall be identified by file number. A termination statement signed by a person other than the secured party of record must include or be accompanied by the assignment or a statement by the secured party of record that he has assigned the security interest to the signer of the termination statement. The uniform fee for filing and indexing such an assignment or statement thereof shall be One Dollar ($1.00). If the affected secured party fails to send such a termination statement within ten days after proper demand therefor he shall be liable to the debtor for One Hundred Dollars ($100.00), and in addition for any loss caused to the debtor by such failure.

(2) On presentation to the filing officer of such a termination statement he must note it in the index. The filing officer shall remove from the files, mark 'terminated' and send or deliver to the secured party the financing statement and any continuation statement, statement of assignment or statement of release pertaining thereto.

(3) There shall be no fee for filing and indexing a termination statement including sending or delivering the financing statement. Laws 1961, p. 177, § 9–404."

The Uniform Commercial Code Comment, following this Section, indicates that there is no duty on the part of the debtor to demand a termination statement. The Comment reads in part:

"Under this Section a debtor *may require* a secured party to send a termination statement when there is no outstanding obligation and no commitment to make future advances." [Emphasis added]