Marshall B. WILMOT and Esta Taca Wilmot, Appellants,

v.

CENTRAL OKLAHOMA GRAVEL COR-PORATION, an Oklahoma Corporation; Marshall R. Wilmot; Barbara Longcri-er; Kate Smalley; Betty Wilmot; Thur-man F. Longcrier; N. L. Speed; Key-stone Acceptance Corporation, a corpo-ration; L. B. Smith, Inc., Southwest, a corporation; First National Bank and Trust Company of Stillwater, a national banking corporation, Appellees.

No. 51221.

Court of Appeals of Oklahoma, Division No. 1.

July 22, 1980.

Rehearing Denied Sept. 9, 1980.

Certiorari Denied Oct. 10, 1980.

Released for Publication by Order of Court of Appeals Oct. 30, 1980.

Armstrong, Burns, Baumert & Maddox by J. E. Burns, Ponca City, for appellants.

Fitzgerald & Worthington by Donald L. Worthington, Stillwater, for appellee The First Nat. Bank and Trust Co. of Stillwater.

BOX, Judge:

An appeal by the plaintiffs below, Marshall B. Wilmot and his wife, Esta Taca Wilmot, from a judgment against them on a promissory note held by the First National Bank of Stillwater, one of the defendants intervenors below.

This appeal arises out of the interaction of many parties involved in the operations and financing of the operations of an Oklahoma business corporation named Central Oklahoma Gravel CorporatioN (COG). In August of 1974, COG, through its president, Marshall R. Wilmot (Skip), entered into a revolving loan arrangement with the First National Bank and Trust Company of Stillwater, Oklahoma (Bank). Pursuant to this agreement, the Bank took over the collection of COG's accounts receivable and required COG to instruct all customers to make their payment to a postal box, to which the Bank possessed the only key. COG was required to furnish the Bank with monthly operating statements, which included lists of accounts receivable. Under the loan arrangement, the Bank made advances to COG so that it could pay off its payables with the Bank taking repayment from the accounts receivable. COG and the Bank executed a "Financing Statement and Security Agreement" dated August 15, 1974, which covered "[a]ll accounts receivable and gravel inventory now owned or

hereafter acquired" of COG and the proceeds thereof. A financing statement was properly filed by the Bank on August 19, 1974.

In the year following the commencement of this financing arrangement, COG lost approximately $150,000. In September of 1975 all advances to COG had been repaid, and the Bank refused to make further advances unless COG could put more capital into the company. To accomplish this purpose, Skip suggested a loan secured by a mortgage on a farm located in Harper County, Oklahoma, which was owned by the appellants (Wilmots). The Bank had the property appraised and agreed to loan $100,000 on it. The Bank prepared a promissory note and mortgage and gave them to Skip so that he could secure the signatures of the Wilmots, who were at that time residing in California. The mortgage was signed by the Wilmots, and the note was signed by the Wilmots and by Skip for COG. The terms of the note called for monthly payments in the amount of $3,275 payable over a period of three years. Skip and the Bank anticipated the repayment would derive from the proceeds of the accounts receivable still controlled by the Bank. But neither the Bank nor COG anticipated that the company would need additional advances to stabilize.

However, two months later, on December 22, 1975, the Bank advanced $35,000 to COG. Then on January 21, 1976, another $40,000 was advanced. Both notes were repaid according to their terms from the proceeds of accounts receivable. On February 18, 1976, a final $60,000 was advanced on a demand note. This note was secured by accounts receivable, and served as the base amount of a revolving loan arrangement. To further collateralize this loan, the Bank and COG executed a security agreement covering certain of COG's equipment, and the Bank perfected this security interest by filing. The Bank made advances and took repayment on this loan from the proceeds of the accounts receivable until COG was placed in receivership on June 18, 1976. At that time COG was indebted to the Bank on the $100,000 and the $60,000 notes. The 1974 financing statement had not been terminated, and on June 16, 1976, another security agreement between these two parties was properly executed, which covered the identical collateral listed in the 1974 security agreement. A financing statement covering the transaction was filed on the same date.

The receivership stemmed out of an action filed in April of 1976 by the Wilmots against COG and certain of its corporate officers. Their petition essentially alleged a misuse of corporate funds and sought an accounting. The appellees, Bank and L. B. Smith, Inc., Southwest (Smith), and other creditors intervened in the action. A receiver was appointed on June 18, 1976, and the assets of COG were liquidated. On July 16, 1976, the trial court granted Smith a judgment against COG on a note and on an open account. On January 7, 1977, the trial court entered judgment for Bank against COG and its guarantors on the $100,000 and $60,000 notes.

The Wilmots' action went to trial on April 26, 1977. At this time the Wilmots dropped their petition and elected to defend against the claims of the Bank. There was approximately $57,000 in the receiver's fund resulting from the sale of the gravel inventory and the collection of accounts receivable. The Bank asserted it was a secured creditor as to these proceeds and sought a first priority interest in them. The Bank sought to satisfy any indebtedness not covered by the receiver's funds by judgment against the Wilmots and COG on the mortgage. Smith asserted priority over general creditors in the funds, but conceded that its position was junior to that of the Bank.

The court entered judgment for the Bank and Smith on the following pertinent findings as evidenced by this court minute:

The Court finds that the promissory note dated October 27th, 1975, payable to the [Bank] in the amount of $100,000.00 and secured by a mortgage was not secured by accounts receivable. Payments made by [COG] on notes that were secured by the accounts receivable were

separate and did not reduce the $100,000.00 note.

Therefore, judgment is granted in favor of the [Bank] and against [Wilmots] in the amount of $82,582.09 with interest in the amount of $6503.34, with interest on the judgment in the amount of 10% per annum until paid, and attorney fees in the amount of $8908.54 and costs.

Priority of creditors claims and payments of valid claims from funds now in the hands of the receiver to be as follows: (1) Judgment in favor of [Bank] for balance due on $60,000.00 note in the amount of $7740.23 plus interest in the amount of $2810.79 with interest on the judgment in the amount of 10% per annum until paid and attorney fees of $1500.00 and costs. (2) [Smith] judgment in the amount of $31,419.19 plus interest and fees on first cause of action and $15,061.87 plus interest and fees on second cause of action.

From this judgment the Wilmots appeal.

To simplify the appeal before us, we will give a synopsis of the issues before the trial court and now before us. COG had been placed in receivership, and a receiver's sale produced funds of approximately $57,000, which represented the proceeds of inventory and accounts receivable. The Appellees, Bank and Smith, were creditor intervenors seeking a share of these funds by way of priority. The Wilmots were indebted on a promissory note to the Bank and had pledged their Harper County real estate as collateral on the note. First we will determine what priorities the Bank and Smith established in the receiver's funds by their evidence. Then we will address the arguments of the Bank and the Wilmots with regard to what collateral secured the $100,000 loan and what rights and obligations these two parties had on this loan.

### I

We begin by determining what right and priority Smith had in the receiver's funds. Smith is a sales and service company that carried an open account with COG. COG became delinquent in payment of the account, and Smith threatened to file suit to collect. This occurred in the fall of 1975, at the same time COG was negotiating the loan with the Bank on the land. Smith decided not to sue, taking instead a promissory note from COG, which represented the past due balance on their account. The note stated it was secured by "[a] Sales Agreement or Chattel Mortgage or Security Agreement bearing even date herewith . . . which instrument is incorporated herein by reference . . . ." No such instrument was introduced into evidence, and one of Smith's officers testified that although Smith executed a security agreement and sent it to COG for COG's signature, it was never returned. Smith filed a financing statement on June 2, 1977, which stated it covered all inventory, all accounts receivable and proceeds therefrom, machinery, sand and gravel, and all equipment. This financing statement was not signed by either party. On this set of facts Smith asserted a security interest in the receiver's funds junior only to that of the Bank, and the trial court so found. This judgment is against the weight of the evidence and contrary to law.

Smith relies on Article 9 of the Uniform Commercial Code, 12A O.S. 1971 (hereinafter cited by U.C.C. section only), to establish its security interest. Nothing in Article 9 will support its arguments, however. To create an Article 9 security interest Smith had to comply with sections 9–203 and 9–204. Therefore, Smith had to enter into a security agreement with COG (debtor), which adequately described the collateral, reduce it to writing, have it signed by COG (debtor), give value for the security interest, and see that the debtor had "rights in the collateral." Smith failed to get a security agreement signed by the debtor, thus it failed to comply with the requirements of Article 9. Therefore, no security interest in favor of Smith came into existence in any property of COG. *See generally* J. White & R. Summers, Uniform Commercial Code § 23–1, at 901 (2nd ed. 1980); § 9–203, Comment 5.

Smith cannot rely on its filed financing statement alone to establish a security

interest. *See, e. g., Mitchell v. Shepherd Mall State Bank*, 458 F.2d 700, 703–04 (10th Cir. 1972). The financing statement itself does not comply with section 9–402(1) because it is not signed either by the secured creditor or the debtor. Since Smith's actions are insufficient to establish either a perfected or unperfected security interest in the accounts receivable or inventory of COG, its position is one of a general creditor with respect to the proceeds thereof. It can share with those creditors only after the interests of secured parties are satisfied. § 9–203, Comment 5; § 9–204, Comment 1.

 Both Smith and the Bank argue that they had an agreement as to the priority of liens and claims which they held against COG. The creditors rely on section 9–316 and the Oklahoma Supreme Court case of *Williams v. First National Bank*, 482 P.2d 595, for this proposition. Section 9–316 allows subordination of claims by agreement by any person entitled to priority. The *Williams* case merely states that an agreement authorized by this section may be parol. The Bank is the only party entitled to priority, and it could subordinate its claim to that of Smith's. It cannot, however, by agreement raise the status of a general creditor without any special priority to a position of priority over other general creditors.

## II

 Next we consider what position the Bank held with respect to the receiver's funds. At the outset of financial arrangements between the Bank and COG a security agreement was executed covering COG's inventory and accounts receivable and the proceeds thereof. It was perfected by filing. We will refer to these documents as the 1974 documents. In June of 1976, yet another security agreement was executed covering the same collateral, and a financing statement was filed. The security agreement was sufficient to grant an interest in the proceeds of the receiver's funds to the Bank, but the financing statement, though filed, was insufficient to perfect the interest in the proceeds because it was not

signed by either party. § 9–204, Comment 1; 9–402(2)(b). These papers will be called the 1976 documents. We will need to examine these documents more closely in the latter part of this opinion, but for now, it is sufficient to state that the evidence conclusively shows that the 1974 documents, taken alone, gave the Bank a perfected security interest in the proceeds of the inventory and accounts receivable, and the 1976 documents gave the Bank an unperfected security interest in those same funds. We do not address whether the 1974 financing statement, which was never terminated, could be looked to for perfection of the 1976 security agreement. On this set of facts, the receiver's funds had to be applied first to any indebtedness of COG to the Bank, because the Bank was the only secured creditor. 75 C.J.S. *Receivers* § 289a, at 930. Then, the remainder of the funds, if any, could be applied in satisfaction of valid claims of general creditors.

## III

Now, we address a second set of issues. The Wilmots argue that since the 1974 documents, specifically the financing statement, were never terminated, the collateral listed therein was at all times during the association of the Bank and COG the primary collateral for all loans made. Based on this assertion, the Wilmots claim that the mortgage was but additional collateral for the $100,000 note. The Wilmots assert that they were accommodation parties on the promissory note executed in conjunction with the mortgage and thus sureties. As sureties, they were entitled to certain considerations unavailable to the usual parties to a note by virtue of 12A O.S. 1971, § 3–606 or under the general suretyship statutes found at 15 O.S. 1971, §§ 371–385. The Wilmots take the position that the Bank impaired the collateral, and the Bank's action released the Wilmots from the obligation they undertook by signing the note. The argument is that all loans granted to COG by the Bank were to be satisfied first out of the proceeds of accounts receivable according to the chrono-

logical order of granting. Instead the Bank satisfied the indebtedness due on loans made subsequent to the $100,000 note before applying the accounts receivable to it, and this action, they say, was an impairment. Also, the Wilmots argue that the receiver's funds must be applied first to the indebtedness due on the $100,000 loan because it was made prior to the $60,000 loan, and because a surety is entitled to have the property of the principal applied to the indebtedness due before the creditor can reach the property of the surety. If the evidence substantiates the Wilmots' claims, the effect will be to greatly reduce the individual liability of the Wilmots to the Bank.

It is important to note here that the Bank never subordinated its claim to that of Smith or any other party in this action by its pleadings or evidence. Any impairment of collateral then took place prior to the Wilmots filing their action in April of 1976. The Bank's position is that the 1974 documents secured its interest in the proceeds of the accounts receivable and inventory, giving it first priority to the indebtedness on the $60,000 note from the time of perfection in August of 1974. The Bank claims that it looked only to the real estate to secure the $100,000 loan at the time it was made, but did decide in June of 1976 to secure even that loan by accounts receivable, inventory, and their proceeds, as evidenced by the 1976 documents.

To resolve these issues we will determine the effect of the 1974 documents. The security agreement is a contract and must be interpreted according to the established rules applied to contract construction. The pertinent provisions are as follows:

2. LOANS. Subject to the terms and provisions of this agreement, Secured Party will make such loans to Debtor as from time to time Secured Party elects to make which are secured by Debtor's Inventory and Accounts Receivable, and the proceeds of each, or either of them hereinafter indicated. All such loans shall be evidenced by promissory notes, in type and form satisfactory to Secured Party,

bearing interest at the rate agreed upon from time to time by the parties.

. . . . .

8. The term of this agreement shall commerce with the date hereof and end on the date when, after written notice from either party to the other that no further loans are to be made hereunder, Debtor pays in full all indebtedness secured hereunder. The provisions of this agreement are full severable.

. . . . .

The security interest herein granted to Secured Party shall, in addition to securing all present debts and obligations, secure all future advances made by Secured Party as loans or for preserving the collateral, and reasonable costs and fees for collection or any indebtedness of Debtor to Secured Party. Secured Party's remedies and rights are cumulative and no waiver, release of party or collateral or extension or other indulgence shall release any party hereto or affect Secured Party's other rights or its rights with respect to any subsequent event whatever.

It is the contention of the Wilmots that the above provisions, when read together, have the effect of giving the Bank a first priority lien on COG's accounts receivable, inventory, and the proceeds thereof as to *each* loan made while the document was in effect. The Bank's position is that the language in clause 2, "as from time to time the Secured Party *elects* to make . . . ," allows the Bank to decide at the time of each loan whether the security agreement applied to that particular loan without notifying the debtor. The Bank argues that it "elected" not to secure the $100,000 loan by the 1974 documents. Rather it "chose" to rely solely on the mortgage as collateral. But in 1976, when the accounts receivable supposedly looked more secure, the Bank "elected" to have the accounts receivable and inventory used as additional collateral for the $100,000 note. The Bank relies on the 1976 documents to support this argument.

■■■ The security agreement is a form contract prepared by the Bank. The collateral therein is to be used to secure the initial loan, as well as any "future advances." This type of security agreement is sanctioned by Oklahoma law. § 9–204(5). *Texas Kenworth Co. v. First National Bank,* Okl., 564 P.2d 222, 224–25. A form contract will be construed most strongly against the party preparing it. *Continental Federal Savings & Loan v. Fetter,* Okl., 564 P.2d 1013, 1019. A contract should be given the interpretation which will most closely approximate the mutual intentions of the parties at the time of contracting. *Johnson v. O–Kay Turkeys, Inc.,* Okl., 392 P.2d 741, 743. Where the contract has several provisions, as the one before us, the intention of the parties is not to be determined by reading a single clause, but from a reading that takes in all of the provisions as an integrated whole. *Scrivner–Stevens Co. v. Boliaris,* Okl., 385 P.2d 911, 914–15; *Tilley v. Allied Materials Corp.,* Okl., 256 P.2d 1110, 1115.

The security agreement clearly applies to *each* and *every* loan made by the Bank to the debtor. To read the term "elect" to mean that the secured party may choose whether or not to use the pledged collateral on a subsequent loan, without notifying the debtor, is to place an arbitrary and one–sided construction upon the contract. The term explicitly means that whenever a loan is granted, the document applies. Either party could have terminated the agreement, but they did not. The purpose of a future advances clause is to ensure that all advances are backed by collateral. To allow a secured party to impose a future advances clause and yet choose to make the all–encompassing security agreement applicable at its will is to allow one party a superior bargaining position, which was not a result of the parties' negotiations. The subsequent actions of the Bank and COG support the theory that the parties intended the accounts receivable and inventory to be collateral for all the Bank's loans to COG. The Bank never relinquished its control of accounts receivable until the receivership. COG continued to furnish the Bank with monthly operating statements, which included lists of accounts receivable. The $100,000 loan, like all the others, was used to maintain COG as a viable business entity. The 1974 financing statement was not terminated, but it could have been by the terms of the security agreement. The evidence shows that the mortgage was intended *only* as additional collateral on the $100,-000 note, because the primary collateral for all loans from the Bank to COG was the inventory and accounts receivable.

Even if this Court could accept the Bank's construction of the 1974 documents, it would not alter the fact that the Bank is the only secured party opting for a share of the receiver's funds. Since the aggregate claim of the Bank exceeds the amount in the receiver's funds, the funds will be applied to this indebtedness. The only way the Bank could lose its right to the funds would be to subordinate its claim to them. It did not. However, this fact does not resolve the further issues raised.

The Wilmots assert they are accommodation parties on the promissory note, but the Bank asserts the Wilmots are makers. Both parties are correct. The Wilmots are makers, because they signed the note in that capacity; but they are also accommodation parties, because they signed the note "for the purpose of lending [their] names to another party on it," in this case to COG. § 3–415(1); 15 O.S. 1971, § 371. The Wilmots are also sureties. § 3–415, Comment 1; *Vinick v. Fourth National Bank,* Okl., 531 P.2d 327, 330–31. Accommodation parties possess certain defenses unavailable to other parties. Section 3–606(1)(b) provides:

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

.　　.　　.　　.　　.

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

We must decide whether the Bank's actions were such to entitle the Wilmots to a discharge, either total or partial, of their indebtedness.

The $100,000 loan was made on October 27, 1975. Subsequently, three additional loans were made to COG. The first two of the three were paid in full, and substantial payments were made on the third, with all repayments taken from the accounts receivable. The Bank was cognizant of the precarious financial condition of COG, and the two entities were in close contact in a combined effort to ensure the company's profitability. While it is true that these efforts failed, it does not necessarily follow that the Bank's actions impaired the collateral.

In *Beneficial Finance Co. v. Marshall*, Okl.App., 551 P.2d 315, 318, this Court determined that the conduct of a holder (Bank) that would unjustifiably impair the collateral was conduct which would not measure up to a standard of reasonable care. *Accord, First National Bank v. Helwig*, 464 S.W.2d 953, 955 (Tex.Civ.App. 1971); J. White & R. Summers, Uniform Commercial Code § 13-15, at 525-26 (2nd ed. 1980).

The Bank continued to loan money to COG after the October 27, 1975 loan. It applied monies from the accounts receivable to satisfy the subsequent loans instead of applying those monies to the total amount due on the prior loan. The evidence shows that the monies in the accounts receivable were sufficient at times prior to the receivership to satisfy the entire indebtedness on the $100,000 note. These facts are not determinative, because the $100,000 note was being paid according to its terms, which required monthly payments. The monthly payments were often late, but only for a period of days. Not a single month passed without the required installment being paid in full. Mr. Wilmot was at the time of the subsequent loans an officer in COG and aware of the company's financial obligations. This is evidenced by the Wilmot's petition in this action, wherein it was alleged that corporate officers were mis-

handling monies of the company. Yet, the Wilmots did not demand that the Bank apply monies from accounts receivable to the $100,000 note. Since no demand was made, the note was being paid according to its terms, and all parties had equal knowledge of the arrangement, we find that the actions of the Bank were reasonable and did not result in unjustifiable impairment of the collateral. This is especially true under the circumstances of this case, because the parties through their actions were seeking a common goal—making COG a going concern. *Accord, Carver, Tinker Field Employees Credit Union*, Okl., 442 P.2d 342. The Wilmots have not proven they are entitled to a discharge under either 12A O.S. 1971, § 3-606(1)(b) or 15 O.S 1971, § 377(2) or § 377(3).

## IV

Finally, we determine in what sequence the monies in the receiver's fund must be applied. As the only secured party in the priority battle, the Bank is entitled to all the receiver's funds. As sureties, the Wilmots receive the benefit of 15 O.S 1971, § 384 which provides:

> Whenever property of a surety is hypothecated with the property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation.

The Wilmots are entitled to have the funds applied first to the $100,000 note. *Muskogee Industrial Finance Corp. v. Perkins*, Okl., 361 P.2d 1065, 1070. This means that the Bank's judgment against the Wilmots must be modified. Under the authority set forth in this opinion, we remand to the trial court with instructions to apply the receiver's funds to the $100,000 note. This will deplete the funds. The judgment for the Bank on the $60,000 note stands but will have to be satisfied from another source. The court is instructed to then determine what amount is still due on the $100,000 note plus appropriate interest amounts, attorney's fees, and costs. This amount will

represent the total judgment against the Wilmots, personally. This is appropriate because the Wilmots, although sureties, are makers and are liable in that capacity, but only to the extent of the contract provisions. 15 O.S. 1971, § 373; 12A O.S. 1971, § 3–413(1).

The judgment for Smith is set aside. The judgment against the Wilmots needs to be modified and is hereby remanded to the trial court to render the proper judgment as delineated herein. In this appeal we assess the costs thereof to all three parties to be shared equally.

REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.

REYNOLDS, P. J., and ROMANG, J., concur.